## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| PHENIX LONGHORN LLC,<br><br>          Plaintiff,<br><br>v.<br><br>AU OPTRONICS CORPORATION,<br>HISENSE ELECTRONICA MEXICO,<br>S.A. DE C.V., HISENSE USA<br>CORPORATION, HISENSE VISUAL<br>TECHNOLOGY CO., LTD., and DOES 1–10,<br><br>          Defendants. | **CIVIL CASE NO. 2:23-cv-00477-RWS-RSP**<br><br>**JURY TRIAL DEMANDED** |
| PHENIX LONGHORN LLC,<br><br>          Plaintiff,<br>       v.<br><br>INNOLUX CORPORATION and<br>DOES 1–10,<br><br>          Defendants. | **CIVIL CASE NO. 2:23-cv-00478-RWS-RSP**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF PHENIX LONGHORN LLC'S
## <u>OPENING CLAIM CONSTRUCTION BRIEF</u>

## <u>TABLE OF CONTENTS</u>

I.     Summary of the Argument ................................................................................................ 1

II.    Background of the Patented Technology ......................................................................... 3

III.   Legal Standards ............................................................................................................... 4

    A.     Claim Construction .............................................................................................. 4

    B.     Indefiniteness ....................................................................................................... 5

IV.    Disputed Terms ............................................................................................................... 6

    A.     '305 Patent ........................................................................................................... 6

        1.     "non-volatile storage cells" ..................................................................... 6

        2.     "connected to" and "coupled to" ............................................................. 8

        3.     "multiplexer" ......................................................................................... 10

        4.     "bank(s)" ................................................................................................ 12

        5.     "external source for the high voltage programming means" ................... 14

    B.     '788 Patent ......................................................................................................... 15

        1.     "Gamma reference control capability" ................................................... 15

        2.     "control circuit" ..................................................................................... 18

        3.     "means for executing a predetermined algorithm" ................................ 20

        4.     "means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor / means for executing said predetermined algorithm" ................. 22

        5.     "predetermined algorithm" ..................................................................... 24

        6.     "optimizing said gamma reference voltage levels" ............................... 25

        7.     "gamma reference voltage levels" ......................................................... 26

V.     Conclusion .................................................................................................................... 28

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
  346 F.3d 1082 (Fed. Cir. 2003) ................................................................... 16

*Adaptix, Inc. v. Ericsson, Inc.*,
  115 F. Supp. 3d 837 (E.D. Tex. 2015) .......................................................... 5

*Apex Inc. v. Raritan Computer, Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003) ................................................................... 19

*Barkan Wireless IP Holdings, L.P. v. Sprint Commc'ns Co., L.P.*,
  No. 2:19-CV-336-JRG, 2020 WL 6271162 (E.D. Tex. Oct. 26, 2020) ............................ 7

*BMC Software, Inc. v. ServiceNow, Inc.*,
  No. 2:14-CV-903-JRG, 2015 WL 4776970 (E.D. Tex. Aug. 13, 2015) ..................... 8, 14

*Canon, Inc. v. TCL Elecs. Holdings Ltd.*,
  No. 2:18-CV-546-JRG, 2020 WL 2098197 (E.D. Tex. May 1, 2020) ......................... 15

*Comark Commc'ns, Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998) .................................................................... 4

*Constant v. Advanced Micro-Devices, Inc.*,
  848 F.2d 1560 (Fed. Cir. 1988) .................................................................... 5

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ............................................................. 13, 27

*Dyfan, LLC v. Target Corp.*,
  28 F.4th 1360 (Fed. Cir. 2022) ................................................................... 17

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
  766 F.3d 1338 (Fed. Cir. 2014) ................................................................... 17

*Freeny v. Murphy USA Inc.*,
  Case No. 2:13-CV-791-RSP, 2015 WL 294102 (E.D. Tex. Jan. 21, 2015) ................ 24

*Innolux Corp. v. Phenix Longhorn LLC*,
  IPR2025-0043, Paper 1 (P.T.A.B. Oct. 15, 2024) ............................... 10, 11, 22

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) .................................................................. 7, 14

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ................................................................... 4, 5

*Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006) ................................................................... 19

*Maurice Mitchell Innovations, LP v. Intel Corp.*,
  No. 2:04–CV–450, 2006 WL 1751779 (E.D.Tex. June 21, 2006) ......................... 5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ............................................................................... 5

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)..............................................................9, 12

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)............................................................11, 13

*Optimum Imaging Techs. LLC v. Canon Inc.*,
    No. 2:19-CV-00246-JRG, 2020 WL 3104290 (E.D. Tex. June 11, 2020) ......19

*Parthenon Unified Memory Architecture LLC v. ZTE Corp.*,
    No. 2:15-cv-00225-JRG-RSP, 2016 WL 310174 (E.D. Tex. Jan. 25, 2016) ..........12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)......................................................4, 8, 13

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)...............................................................23

*Sage Prods. v. Devon Indus.*,
    126 F.3d 1420 (Fed. Cir. 1997)...............................................................16

*Santarus, Inc. v. Par Pharms., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012)...............................................................11

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017) ...............................................................5

*Synqor, Inc. v. Cisco Systems, Inc.*,
    No. 2:11-CV-00054, 2014 WL 1338712 (E.D. Tex. Jan. 2, 2014).................12

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008)................................................................5

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002).................................................................4

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012).................................................5, 8, 15, 26

*TQP Dev., LLC v. Intuit Inc.*,
    No. 2:12-CV-180-WCB, 2014 WL 2810016 (E.D. Tex. June 20, 2014) ...........7, 11

*Traxxas LP v. Hobby Prods. Int'l*,
    No. 2:14-CV945-JRG-RSP, 2015 WL 5117030 (E.D. Tex. Aug. 28, 2015) ...........6

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)............................................................5, 12

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).................................................................4

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)...............................................................16

*Wistron Corporation et al. v. Phenix Longhorn, LLC*,
    IPR2018-01255, Paper 8 (P.T.A.B. Oct. 29, 2018) ............................11, 12, 13

**Statutes**

35 U.S.C. § 112 ................................................................................................ 5, 17, 19

35 U.S.C. § 282(a) .................................................................................................... 5

Pursuant to the Court's Docket Control Order (Dkt. 67 in Case No. 2:23-cv-00477 and Dkt. 34 in Case No. 2:23-cv-00478), Plaintiff Phenix Longhorn, LLC ("Phenix" or "Plaintiff") respectfully submits this Opening Claim Construction Brief in support of its claim construction positions for the disputed terms of the asserted patent claims.

## I.    SUMMARY OF THE ARGUMENT

Defendants[1] ask the Court to construe 13 disputed claim terms across three asserted claims. This Court already previously construed eight terms of U.S. Patent No. 7,233,305 (the "'305 Patent," Ex. A)[2] in a prior litigation. *Phenix Longhorn, LLC v. Wistron Corp.*, No. 2:17-CV-00711-RWS, 2019 WL 2568476 (E.D. Tex. June 21, 2019) (Schroeder, J.) (Ex. C, the "Wistron Order"). Unsatisfied with the Court's prior constructions, Defendants seek to reopen the construction of two of the eight terms already construed and request construction of four additional terms of the '305 Patent.[3] Defendants further assert that six claim terms of the sole asserted claim of U.S. Patent No. 7,557,788 (the "'788 Patent," Ex. B) are indefinite, and an additional term requires construction.[4]

---

[1] Defendants as used herein include Innolux Corporation ("Innolux"), AU Optronics Corporation ("AUO"), Hisense Electronica Mexico, S.A. de C.V. ("Hisense Mexico"), Hisense USA Corporation ("Hisense USA"), Hisense Visual Technology Co., Ltd. ("Hisense Visual") (collectively, "Defendants").

[2] All Exhibits referenced herein refer to the exhibits attached to the Declaration of Rodney Miller, filed contemporaneously herewith.

[3] The six disputed terms from the asserted claims of the '305 Patent include: "non-volatile storage cells," "coupled to," "multiplexer," "connected to," "bank(s)," and "external source for the high voltage programming means."

[4] The seven disputed terms from the asserted claims of the '788 Patent include: "Gamma reference control capability," "control circuit," "means for executing a predetermined algorithm," "means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor / means for executing said predetermined algorithm," "predetermined algorithm," "optimizing said gamma reference voltage levels," and "gamma reference voltage levels."

In the prior claim construction order, the Honorable Judge Schroeder conducted a thorough analysis of the '305 Patent, its terms, and issued proper constructions. Each of the remaining terms of the '305 Patent (i.e., "coupled to," "connected to," "bank(s)," and "external source for the high voltage programming means") have a well-understood meaning in view of the claims and specification, which the jury will readily understand, and do not require construction. Phenix's positions are consistent with the Court's prior claim construction order, and submits that the "non-volatile storage cells" term require no construction. Phenix respectfully requests that the Court adopt its plain and ordinary meaning constructions, which are consistent with the intrinsic record and the understanding of a person of ordinary skill in the art (POSA) at the time of the claimed invention, and reject Defendants' proposed constructions for these four claim terms.

For the previously construed terms of the '305 Patent Phenix respectfully requests the Court to adopt its prior constructions. However, Innolux raised additional disputes as to the meaning of the Court's prior construction of "multiplexer" before the Patent Trial and Appeal Board (PTAB). As a result, Phenix respectfully requests the addition of the word "selectively" to the Court's previous construction to resolve Innolux's belated attempt to re-litigate that construction.

Defendants incorrectly assert that six claim terms of the '788 Patent are indefinite by feigning confusion over terms with clear language and support in the intrinsic record. For instance, three of the claim terms are encompassed by a single means-plus-function term—"means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor"—that Defendants attempt to break up into discrete, separate terms, depriving them of context. A POSA would understand with reasonable certainty these claim terms, when read in view of the surrounding claim language and specification.

Defendants also argue that another term of the '788 Patent, "control circuit" is indefinite although a POSA would understand with reasonable certainty the scope of this term based on the claim language. Defendant AUO also argues this term is in means-plus-function form despite clear Federal Circuit precedent holding that "circuit" is a structural term that does not invoke pre-AIA 35 U.S.C. 112, paragraph 6. The final two claim terms of the '788 Patent Defendants argue are indefinite—"gamma reference control capability" and "optimizing said gamma reference voltage levels"—a POSA would understand with reasonable certainty the scope of these terms viewed in light of the specification. Finally, despite the term's straightforward use in the claims, Defendants seek to restrict the claim term "gamma reference voltage levels" to only its preferred embodiment. As with their arguments for the claim term "non-volatile storage cells," Defendants' attempts to narrow the claim scope fail because such narrowing is unsupported by the intrinsic record.

## II.    BACKGROUND OF THE PATENDED TECHNOLOGY

Phenix has alleged that Defendants infringe claims of the '305 and '788 Patents by making, selling, and importing the inventions described therein. The '305 and '788 Patents share a common specification. While the metes and bounds of each asserted claim are defined by the respective claim itself, the inventions of the '305 and '788 patents relate to a programmable buffer integrated circuit that can be programmed to output a set of gamma correction reference voltages to be used in various types of displays. Once programmed, the buffer will continuously output the programmed value; if power is removed, since the voltage value is stored in non-volatile, programmable memory, the gamma correction is retained. The '305 Patent claims the programmable gamma correction integrated circuits ("pgamma chips") that are capable of selecting, storing, and outputting the desired gamma reference voltages to the display. *Id.* The

'788 Patent claims a method for calibrating such pgamma chips whereby a sensor is used in combination with variations of the gamma reference voltage levels to appropriately calibrate the desired gamma reference voltage levels of the pgamma chip.  Ex. B at Claim 1.  The inventions of the '305 and '788 Patents thereby allows for "automated assembly of an entire PC board, automated test and gamma adjustment, smaller and thinner physical size, lower power consumption, reprogrammable and non-volatile settings."  *Id*. at 2:29-33.

## III.    LEGAL STANDARDS

### A.          Claim Construction

The "claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  Claim terms "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  Indeed, construing claims often "involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  "[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370, 116 S. Ct. 1384 (1996)).  "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 [Fed. Cir. 1996]).  But "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-*

*Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)).  Claim construction is "not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Where a term is used in accordance with its plain meaning, the court should not replace it with different language. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) ("[W]e do not redefine words. Only the patentee can do that.").

"In general, prior claim construction proceedings involving the same patents-in-suit are 'entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se.*'" *Adaptix, Inc. v. Ericsson, Inc.*, 115 F. Supp. 3d 837, 842 (E.D. Tex. 2015) (quoting *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04–CV–450, 2006 WL 1751779, at *4 (E.D.Tex. June 21, 2006)) (emphasis in original).

### B.    Indefiniteness

All issued patents are presumed valid.  35 U.S.C. § 282(a).  35 U.S.C. § 112 requires that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  This standard "mandates clarity, while recognizing that absolute precision is unattainable." *Id.*   "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008) (stating that the party challenging validity "has the burden of persuasion to show by clear and convincing evidence").

If the claim language "inform[s], with reasonable certainty, those skilled in the art about the scope of the invention[,]" it is not indefinite. *Nautilus*, 572 U.S. at 901.  Additionally, a patent

claim is not indefinite if "someone working in the relevant technical field could understand the bounds of a claim." *Traxxas LP v. Hobby Prods. Int'l*, No. 2:14-CV-945-JRG-RSP, 2015 WL 5117030, at *3 (E.D. Tex. Aug. 28, 2015) (citation omitted).

## IV.    DISPUTED TERMS

### A.        '305 Patent

Six terms from the '305 Patent's asserted claims are in dispute.

#### 1.    "non-volatile storage cells"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| memory cells which retain stored data even when power is removed. | Analog memory cells which retain stored data even when power is removed | Analog memory cells which retain stored data even when power is removed |

The Court previously construed "non-volatile storage cells" to mean "memory cells which retain stored data even when power is removed." *See* Ex. C at 18-25.  Phenix respectfully requests that the Court adopt its prior construction.  Defendants' proposed construction is inconsistent with the POSA's understanding of the term and would narrow the scope of the term to analog technology.

This Court, however, has already rejected this narrow reading of the claims in the Wistron Order.  *Id*. at 23 ("Defendants have not shown a clear intention to limit the ordinary meaning of the term.").  This Court found that in an ordinary meaning a 'non-volatile storage cell' may store either digital values or analog values."  Ex. C at 23.  Defendant AUO's expert also agreed that non-volatile storage cells can be designed to store either analog or digital values.  Ex. D at 30:12-17 (Deposition of Dr. Paul S. Min) ("Q: Can a non-volatile storage cell be designed to store digital information? A: Certain type of non-volatile storage cell would. Not all. Q: But they can, correct? A: Certain types can, yes.").  The Court further found that the intrinsic record contains no clear

and unmistakable disclaimer of digital approaches to storage. Ex. C at 23-24. Specifically, the Court decided that although the sole embodiment of the specification contains an analog non-volatile storage cell, "it is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Id.* (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Finding that "[t]he primary focus of the description of the storage cells is the programmable nature of the storage cells, not a distinction between analog and digital storage cells." *Id.* (citing '305 Patent at 3:6–7:19). Moreover, as the Court recognized, any alleged disparagement "is not a general disparagement of digital circuits because the prior art that is criticized includes both analog and digital approaches." *Id.* (citing '305 Patent at 1:28–37, 1:46–2:4, 2:6–9, Figure 1).

Defendants cannot provide a strong reason for the Court to depart from its prior construction of this term, as the proposed construction merely repeats the same arguments (*i.e.*, that the term should be limited to 'analog' memory) that this Court has already considered and rejected. *See TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Barkan Wireless IP Holdings, L.P. v. Sprint Commc'ns Co., L.P.*, No. 2:19-CV-336-JRG, 2020 WL 6271162, at *14-15, *18 (E.D. Tex. Oct. 26, 2020) ("Plaintiff fails to sufficiently justify departing from the analysis and construction set forth in [the prior litigation]."). As such, Phenix requests that the Court not deviate from its prior construction.

### 2.     "connected to" and "coupled to"

| Term | Phenix's Construction | AUO's Construction | Innolux's Construction |
|------|----------------------|---------------------|------------------------|
| "connected to" | Plain and ordinary meaning. | directly and/or physically linked or joined | directly linked or joined |
| "coupled to" | Plain and ordinary meaning. | Indirectly or directly linked or joined | Indirectly or directly linked or joined. |

The Court should construe this term according to the plain and ordinary meaning. Defendants proposed construction improperly limits the terms' scope by contending that "coupled to" may be "*indirectly* or directly" linked or joined whereas "connected to" may only be "directly or *physically*" linked or joined. The Court, however, does not need to undertake the burden in analyzing Defendants' misconstructions. Both terms are used in a straightforward manner.

The term "connected to" appears as "drivers *connected to* said storage cells and to the plurality of outputs," and "coupled to" appears as "circuits for programming *coupled to* a multiplexer." *See* Ex. A at Claim 1. The unambiguous and straightforward use of the terms thereby eliminates the Court's need to further construe the patentee's own language. *BMC Software, Inc. v. ServiceNow, Inc.*, No. 2:14-CV-903-JRG, 2015 WL 4776970, at *54 (E.D. Tex. Aug. 13, 2015) (finding plain and ordinary meaning appropriate for "straightforward" term that was "unambiguous and . . . easily understandable"); *Thorner*, 669 F.3d at 1366-67 ("[W]e do not redefine words. Only the patentee can do that."). Notwithstanding the jury's ability to easily understand the terms, Defendants' proposed constructions of "connected to" improperly seeks to limit the term's scope to require a direct or physical connection. However, such a limitation is neither supported by the claim language nor the specification. For example, claim 8 of the '305 Patent recites "an output pin *connected to* an output *through* a second multiplexer," which suggests the possibility of a non-physical connection between an output pin and an output because the connection can be made through the second multiplexer. *Phillips*, 415 F.3d at 1314 (noting that

"[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term," and "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims").  Further, the specification suggests an embodiment that can include a display optimization algorithm non-physically connected to a monitor through a PC.  '305 Patent at 7:16-19 ("Display optimization algorithms may be located in such a PC which also may be connected to monitors feeding back data from the display during the optimization tuning at time of manufacture.").

The term "coupled to," which appears in the claim as "circuits for programming *coupled to* a multiplexer," is also a simple term that requires no construction as would be easily understood to mean coupled, both directly or indirectly.  Defendants' proposed construction introduces new and ambiguous terminology, such as "linked or joined," which will neither clarify the construction nor aid the jury.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims.").  As such, Phenix requests that the Court adopt its proposed construction.

### 3. "multiplexer"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| one or more circuits that selectively couple (1) one input (or one set of inputs) to one of many outputs (or one set of many sets of outputs) or (2) one of many inputs (or one set of many sets of inputs) to one output (or one set of outputs) | one or more circuits, excluding an I2C serial bus, that couple (1) one input (or one set of inputs) to one of many outputs (or one set of many sets of outputs) or (2) one of many inputs (or one set of many sets of inputs) to one output (or one set of outputs) | one or more circuits that couple (1) one input (or one set of inputs) to one of many outputs (or one set of many sets of outputs) or (2) one of many inputs (or one set of many sets of inputs) to one output (or one set of outputs) |

The distinction between the parties' proposed construction is the inclusion of the POSA's understanding of the term "multiplexer." The parties appear to agree that the '305 patent describes "multiplexer" as "one or more circuits that couple (1) one input (or one set of inputs) to one of many outputs (or one set of many sets of outputs) or (2) one of many inputs (or one set of many sets of inputs) to one output (or one set of outputs)," which is consistent with the agreed construction from the Wistron Litigation. *See* Ex. C at 13. However, in light of Defendant Innolux's position before the PTAB, Phenix requests that the Court clearly include the functionality of the multiplexer, which is included in Phenix's proposed construction.

Phenix respectfully requests the Court to construe the claim's "multiplexer" term to include the additional "*selectively* couple" language in place of its previous construction which used the term "couple" alone. The proposed "selectively" language expressly reflects the multiplexer's core functionality wherein it takes one input and *selects* one of many outputs to send the signal (or in the case of a demultiplexer, it *selects* one of many inputs to send to a single output). Phenix's proposed addition stems from Innolux's recent briefing of the term in a denied petition for *inter partes* review which indicates that ambiguities remain as to the function of the term's use of the word "couple." In its Petition, Innolux attempted to classify an alleged prior art reference's "serial interface" as the '305 Patent's "multiplexer." *See Innolux Corp. v. Phenix Longhorn LLC*,

IPR2025-0043, Paper 1 at 38-40 (P.T.A.B. Oct. 15, 2024) ("While not explicitly called a multiplexer, a POSA would understand the serial interface 1 includes multiplexing functionality to route serial data to multiple registers based on addressing."). Such analysis fails to include the required "selecting" functionality of the '305 Patent's multiplexer and thereby requires clarification by the Court. *See TQP Dev.*, 2014 WL 2810016, at *5 ("As the Court explained in its earlier order, the need for further construction of the limitation at issue arose because the apparent agreement between the parties as to the proper claim construction masked real disagreement about the meaning of the claim language and the language used in the proposed construction. Without further claim construction, that disagreement would likely manifest itself at trial, when the problem would be more difficult to resolve."). Phenix's proposed construction is consistent with the intrinsic record.

AUO's proposed construction, written in its negative form, is likely to cause unnecessary confusion for a jury. The parties agree that an I2C serial bus is a different structure than a multiplexer. *See Innolux Corp. v. Phenix Longhorn, LLC*, IPR2025-0043, Paper 6 at 55 (P.T.A.B. Mar. 12, 2025) ("The I2C serial interface identified in Patent Owner's infringement contentions, however, were noted for support of Innolux's infringement of the 'wherein the addressing is based on a plurality of inputs' claim element, and not to demonstrate the existence of a multiplexer."); *Wistron Corporation et al. v. Phenix Longhorn, LLC*, IPR2018-01255, Paper 8 at 24 (P.T.A.B. Oct. 29, 2018) ("But Wistron's contention is flawed because it claims that the I2C serial interface satisfies the plurality of inputs limitation, not the multiplexer."). Courts typically decline to adopt constructions that contain negative limitations absent express disclaimer. *See Santarus, Inc. v. Par Pharms., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012) ("Negative claim limitations are adequately supported when the specification describes a reason to exclude the relevant limitation."); *see also*

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (declining to add a negative limitation when there was no "express disclaimer or independent lexicography in the written description that would justify adding that negative limitation"); *Parthenon Unified Memory Architecture LLC v. ZTE Corp.*, No. 2:15-cv-00225-JRG-RSP, 2016 WL 310174, *8 (E.D. Tex. Jan. 25, 2016).  Given the lack of express disclaimer and the developed record relating to the distinction between a "multiplexer" and I2C serial bus, AUO's proposed construction should be rejected.  As such, Phenix requests that the Court adopt its proposed construction.

### 4.    "bank(s)"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Plain and ordinary meaning. | contiguous sections of addressable computer memory arranged in n by m matrix format | [N/A] |

Given the term "bank(s)" unambiguous and easily understandable use in Claim 1 of the '305 Patent, the term does not require construction.  *U.S. Surgical Corp.*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").  AUO[5] seeks to reword the claim term's simple shorthand for the commonly used term "memory *bank*" into a convoluted form that not only would confuse the jury, but would unnecessarily limit the term's scope counter to the patentee's unambiguous choice of term.  *Synqor, Inc. v. Cisco Systems, Inc.*, No. 2:11-CV-00054, 2014 WL 1338712, at *11 (E.D. Tex. Jan. 2, 2014) (adopting plaintiff's proposed ordinary meaning construction and finding "[d]efendants' construction generally rewords the claims" and the original claim language

---

[5] Both Phenix and Innolux believe the claim term does not require construction.

"appear[ed] sufficiently clear and understandable for presentation to a jury."). The Court's prior claim construction order in the *Wistron* litigation and the Board in the prior *Wistron* Petition for *inter partes* review both construed claim terms that utilize the term "bank(s)" without any ambiguity to the word's use in the claim term. For example, the Court and the Board previously construed the term "means to switch between the banks based on one or more external signals" wherein the Court refers to the specification's description of "the use of banks and slowing the transition between banks by damping when switching between banks." Ex. C at 45 (citing '305 Patent at 5:62-6:21); *Wistron Corp. v. Phenix Longhorn, LLC*, IPR2018-01255, Paper 14 at 10-12 (P.T.A.B. Jan 24, 2019).

The Board's decision to deny the *Wistron* Petition for *inter partes* construed the term "banks of cells" as "contiguous sections of addressable, computer memory." *Wistron Corp. v. Phenix Longhorn, LLC*, IPR2018-01255, Paper 14 at 14-15 (P.T.A.B. Jan 24, 2019) (Ex. E). AUO's proposed construction seeks to further confine "bank(s)" as "contiguous sections of addressable computer memory *arranged in n by m matrix format*." The intrinsic evidence provides no disclaimer or disavowal of other arrangements of memory. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012) ("To specifically exclude [a particular feature] would thus require a waiver of claim scope that is 'both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.'") (citing *Omega Eng'g,* 334 F.3d at 1325–26). The intrinsic evidence also fails to identify any support for AUO's contention that "banks(s)" would be required to be arranged in an "n by m matrix format." The term matrix is not found in the specification at all. Further, to the extent that AUO or its expert contend that the patent's figures exemplify an "n by m matrix format," the law is clear that claim terms are not restricted to the embodiments in the patent's figures. *See Phillips*, 415 F.3d at 1323 ("[A]lthough

the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *see also Liebel-Flarsheim*, 358 F.3d at 913 ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").  As such, Phenix requests that the Court adopt its proposed construction.

### 5.    "external source for the high voltage programming means"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
| --- | --- | --- |
| Plain and ordinary meaning. | [N/A] | a voltage source for the high voltage programming means that is not inside or a part of the claimed integrated circuit. |

The parties agree with the Court's construction that the term "high voltage programming means" is a means-plus-function term with a function of "programming the non-volatile storage cells using a high voltage signal" and a structure comprising, among other things, "a Program Interface," and "a V$_{pp}$ input."  Dkt. 120 at 2-3 (AUO) Dkt. 77 at 2-3 (Innolux).  Innolux seeks to further construe the "external source for the" claim language as confined to "*a voltage source for the high voltage programming means that is not inside or a part of the claimed integrated circuit*." Both Phenix and AUO disagree that the additional "external source for the" phrase requires construction beyond the Court's prior construction of the term "high voltage programming means." The disputed portion of the claim term—"external source for the"—uses unambiguous and straightforward language the jury would readily understand.  *See BMC Software*, 2015 WL 4776970, at *54 (finding plain and ordinary meaning appropriate for "straightforward" term that was "unambiguous and . . . easily understandable").  Further, the intrinsic record fails to provide

any reason to limit or reword the term's scope. *Thorner*, 669 F.3d at 1366-67 ("[W]e do not redefine words. Only the patentee can do that.").

Contrary to the claim's current straightforward language, Innolux's proposed construction inserted into the term only adds ambiguity and therefore declined. *See Canon, Inc. v. TCL Elecs. Holdings Ltd.*, No. 2:18-CV-546-JRG, 2020 WL 2098197, at *10-11 (E.D. Tex. May 1, 2020) (denying Defendants' proposed construction where it would "add[] increased ambiguity to the claim" when the disputed term alone "is readily understood by a jury"). As such, Phenix requests that the Court adopt its proposed construction.

**B.      '788 Patent**

Seven terms from the '788 Patent's asserted claims are in dispute. AUO Dkt. 120; Innolux Dkt. 77. Each of the disputed claim terms appears in asserted Claim 1 of the '788 Patent.

**1.      "Gamma reference control capability"**

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Plain and ordinary meaning. | Indefinite. Alternatively, to the extent the Court decides the term is not indefinite, the term should be construed as:<br><br>**Function:** programming and storing gamma reference voltage values in storage cells that are used to generate gamma reference voltage outputs and switching between different gamma settings to implement dynamic gamma correction<br><br>**Structure:** Fig. 2 (programming interface 230, gamma reference controller 210, and gamma reference controller 220) AND Fig. 3 (programming engine 310, | Indefinite under § 112<br><br>To the extent the court decides the term is not indefinite, the term should be construed as:<br><br>"a stand-alone, non-volatile device that is electrically reprogrammable, the device including a programing interface and two gamma reference controllers physically connected to the programming interface, the two gamma reference controllers being physically connected to |

| | Analog Input, R/W, MUX 320, A0, A1, A2, and floating gate memory cells 330-337) AND Fig. 5 (Tdamp) OR Fig. 6 (programming interface, Vpp, MUX, A0, A1, Bank Select, B0, B1, B2, floating gate memory cells) AND Fig. 5 (Tdamp) and equivalents thereof. | source drivers connected to a panel." |
|---|---|---|

The term "gamma reference control capability" is not a means-plus-function term because the claim expressly sets forth a structure. Further, the term is not indefinite because the meaning of the term is clear to a POSA in view of the intrinsic record. *See* Ex. F at ¶¶ 33-35 (Declaration of Joseph McAlexander).

First, there is a presumption that the "gamma reference control capability" term is not a means-plus-function term because it does not use the word "means." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348-49 (Fed. Cir. 2015). Second, the term recites functional language (*i.e.*, "gamma reference control capability") that is associated with a structure (*i.e.*, a display). *Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1427–28 (Fed. Cir. 1997) (means-plus-function does not apply when claims recite sufficient structure, material, or acts to perform the function). As set forth in the surrounding claim, claim 1 includes, in part, the steps of "providing said ***display with gamma reference control capability*** which is electrically reprogrammable and non-volatile" and "***storing*** said gamma reference voltage levels ***in said gamma reference control capability***." Ex. B at Claim 1; 7:27-29; 7:41-42 (emphasis added). In other words, the surrounding claim language denotes that the "gamma reference control capability" is a functional capability provided to the display and this functional capability is electrically reprogrammable, non-volatile, and can store gamma reference voltage levels. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed.

Cir. 2003) ("the context of the surrounding words of the claim . . . must be considered in [construing a claim term] . . . ."); *see also* Ex. F at ¶ 34.

Further, the term is not indefinite because a POSA would understand with reasonable certainty the scope of the invention. *Id*. at ¶¶ 33-35. For example, the Summary of the Inventions explains that the inventions are generally directed to a programmable buffer integrated circuit which can be programmed to output a set of gamma correction reference voltages to be used in LCDs. *See* Ex. B at 2:17-28. The specification further describes, as an example, a display with a "gamma reference circuit" that employs "gamma reference controllers." *Id*. at 2:61-3:5; FIG. 2. The specification further teaches that "gamma reference controllers" comprise a programming interface, multiplexer, programmable floating gate memory cells, and drivers. *Id*. at FIG. 3. As such, a POSA would understand the plain and ordinary meaning of the term "gamma reference control capability" to refer to functional capability that can be incorporated into the display to control, reprogram, and/or store the gamma reference voltage levels. *See* Ex. F at ¶ 34.

The presumption against means-plus-function claiming has not been overcome, and AUO's proposed construction should be rejected. *See Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) ("Claim terms 'need not connote a single, specific structure,' and may instead 'describe a class of structures' and still recite 'sufficiently definite structure' to not invoke § 112 ¶ 6") (citation omitted). Further, Innolux's alternative construction correctly identifies this term as not a means-plus-function term but introduces unnecessary ambiguity because of its length and seeks to limit the scope of the term to a specific number of gamma reference controllers and requirement that these controllers be "physically connected" to sources drivers and the programming interface—which would improperly limit the scope of the claim to one possible embodiment. *EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014)

("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). As such, Phenix requests that the Court adopt its proposed construction.

### 2. "control circuit"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Plain and ordinary meaning. | Indefinite. Alternatively, to the extent the Court decides the term is not indefinite, the term should be construed as:<br><br>**Function:** varying gamma reference voltage levels on columns of a display<br><br>**Structure:** Fig. 2 (gamma reference controller 210 AND gamma reference controller 220) AND Fig. 3 (programming engine 310, Analog Input, R/W, MUX 320, A0, A1, A2, and drivers 340-347) OR Fig. 6 (programming interface, Vpp, MUX, A0, A1, Bank Select, B0, B1, B2, and drivers (not numbered)) | Indefinite under § 112<br><br>To the extent the court decides the term is not indefinite, the term should be construed as: "a stand-alone integrated circuit attached to and separate from a liquid crystal display, the integrated circuit including a programing interface and two gamma reference controllers physically connected to the programming interface, the two gamma reference controllers being physically connected to source drivers connected to a panel of the liquid crystal display." |

The term "control circuit" is not indefinite and the Court should construe it according to its plain and ordinary meaning. The Court should reject the limitations sought by Defendants' proposed construction of "control circuit." This Court in the Wistron litigation and the Federal Circuit have held that the term "circuit" denotes a known class of structures, generally understood by a POSA. *See* Ex. C at 15 (finding "circuits for programming" in the '305 patent not indefinite

and noting that "[t]he Federal Circuit has repeatedly and consistently found that, in the electronic arts, 'circuit' or 'circuitry' terms connote" sufficient structure to avoid means-plus-function claiming); *see also Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1355-56 (Fed. Cir. 2006) ("[T]he term 'circuitry,' by itself, connotes structure"); *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1374 (Fed. Cir. 2003) ("The term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art."). Here, a POSA would understand that "control circuit" as used in the claims denotes sufficient structure (i.e., circuit) to perform the recited function (e.g., control). *See* Ex. F at ¶¶ 36-38. For example, Claim 1 of the '788 patent explains that "control circuit" exercises its control by varying the gamma reference voltage levels for the display columns. Claim 1 further notes that the "control circuit" is separate from the display. Thus, a POSA could look to the claim language and determine what the claim means by "control circuit." *Id*. at ¶ 37.

Defendants' alternative constructions miss the mark and undermine their indefiniteness position. *Optimum Imaging Techs. LLC v. Canon Inc*., No. 2:19-CV-00246-JRG, 2020 WL 3104290, at *9 (E.D. Tex. June 11, 2020). AUO's construction attempts to obtain a means-plus-function construction, while avoiding the high hurdles to invoking § 112 ¶ 6. As previously stated, this Court and the Federal Circuit have repeatedly rejected such attempts to limit "circuits" to a means-plus-function limitation. And Innolux's construction should also be rejected because it improperly adds limitations into the claims and creates ambiguity, contrary to the term's straightforward use in the claims defining what the control circuit does. As such, Phenix requests that the Court adopt its proposed construction.

3.    "means for executing a predetermined algorithm"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Function: executing a predetermined algorithm.<br><br>Structure:  programming interface such as Fig. 2 (programming interface 230), Fig. 6 (programming interface), 6:1-14, or 6:57-64 (PC based programming interface) and equivalents thereof. | [N/A] | The "means for executing" is a general purpose processor.  The term "predetermined algorithm" is Term 11 and is indefinite for the reasons stated as to Term 11.[6]<br><br>If the term is a Means-Plus-Function term, it is indefinite for failure to clearly define the claimed function, and for lack of corresponding structure or algorithm in the specification. |

The parties appear to agree that "means for executing a predetermined algorithm" should be construed as a means-plus-function limitation, but disagree as to the meaning of the phrase.[7] This phrase appears in Claim 1 of the '788 Patent as "optimizing said gamma reference voltage levels using means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor." Ex. B at 7:36-38.  Phenix proposes that the function for this limitation is "executing a predetermined algorithm."  And consistent with the specification, the structure corresponding to this limitation should be construed as the "programming interface

_____

[6] References to term numbers correspond to the terms numbered in the parties' Exhibits to the Joint Claim Construction Statement. *See* AUO Dkt. 120; Innolux Dkts. 77 and 81-2.

[7] AUO and Innolux disagree on the specific language of the claim term to be construed.  Innolux alleges indefinites of the term "means for executing a predetermined algorithm" and AUO alleges indefiniteness of the longer term "means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor."  *See* AUO Dkt. 120-1 at 24-29; Innolux Dkt. 81-2 at 21-26.  Phenix respectfully requests the Court only to construe the term "means for executing a predetermined algorithm" consistent with Phenix's means plus function construction of the term.  Nevertheless, Phenix addresses the constructions of both terms herein.

such as Fig. 2 (programming interface 230), Fig. 6 (programming interface), 6:1-14, or 6:57-64 (PC based programming interface) and equivalents thereof."

The specification explains that an integrated circuit incorporates a "programming interface" that allows for programming circuit's outputs to the desired (*i.e.*, optimized) gamma reference voltage values during manufacturing and testing of the panel. *Id.* at 2:23-26. The specification further explains, as an example, that the "programming interface" comprises "a common Analog Input ($A_{IN}$) which will be used to set the reference voltage level, three address inputs ($A_0$, $A_1$, and $A_2$) to determine which reference level is being written and a R/W control signal for each of the first gamma reference controller 210 and second gamma reference controller 220, in this case two, that are on the board." *Id.* at 3:6-12. The specification additionally teaches, as an example, that the programming of the selected storage cells, utilizing the programming interface, is initiated by pulsing $V_{PP}$ to a desired voltage level. *Id.* at 6:1-14. The specification additionally explains that "a predetermined set of voltage values" (*i.e.*, predetermined desired voltage levels) can be stored, utilizing the programming interface, into the integrated circuit prior to mating with a display. *Id.* at 6:41-47. The specification also describes that a PC based "programming interface" may be used as an alternative source to adjust voltage pulses in the integrated circuit to a desired level and that "display optimization algorithms" located in the PC can be used during "the optimization tuning at time of manufacture." *Id.* at 6:57-64. The specification further teaches that desired voltage values can be achieved based on "predetermined light matching for the display" and these voltage values can be saved in the integrated circuit, utilizing the circuit's programming interface. *Id.* at 7:1-6. This makes this limitation definite, and

Defendants cannot meet their high standard to prove otherwise.[8] *See also* Ex. F at ¶¶ 39-47.  As such, Phenix requests that the Court adopt its proposed construction.

    **4.**    **"means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor / means for executing said predetermined algorithm"**

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Subject to Plaintiff's Proposed construction of Term 10, any additional language of Term 11 should be given its plain and ordinary meaning. | Indefinite.  Alternatively, to the extent the Court decides the term is not indefinite, the term should be construed as:<br><br>**Function:** execution of an algorithm that optimizes gamma reference voltage levels based on (1) data sensed by at least one sensor and (2) the application that is being displayed, external environment such as temperature and ambient light, or the personal preference of the user<br><br>**Structure:** Fig. 2 (programming interface 230), Ain, A0, A1, A2, R/W control signal or Fig. 6 (programming interface, Vpp, Aout, A0, A1), 6:1-14 or 6:57-64 (PC programming interface connected to monitors feeding back data from the display during optimization tuning at a time of manufacturing) and equivalents thereof. | The "means for executing" is a general purpose processor.  The term "predetermined algorithm" in Term 11 and is indefinite for the reasons stated as to Term 11.  The rest of the clause should be given its plain and ordinary meaning.<br><br>If the term is a Means-Plus-Function term, it is indefinite for failure to clearly define the claimed function, and for lack of corresponding structure or algorithm in the specification. |

---

[8] Innolux's assertion of indefiniteness is in direct conflict with its prior statements to the USPTO where it conceded that a POSA would understand the term's plain and ordinary meaning. *See Innolux Corp. v. Phenix Longhorn LLC*, IPR2025-0044, Paper 8 at 5 (P.T.A.B. Apr. 2, 2025) ("The plain and ordinary meaning of 'means for executing a predetermined algorithm . . .' connotes a general-purpose processor, which is understood as structure sufficient to perform the function,"…"*[b]ecause the term recites sufficient structure (a processor executing a specific predetermined algorithm)*, § 112(f) does not apply.") (emphasis added). Innolux's feigning confusion as to the structure required for the term is therefore meritless.

The term "means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor" is not indefinite.  At the outset, the organization of Defendants' terms for construction create unnecessary confusion.  For instance, Phenix identified the straightforward means-plus-function term that was the subject of the previous Section – "means for executing a predetermined algorithm" – as a term for construction.  Here, Defendant AUO seeks to construe the very same term with the additional language that follows it in the claim – "according to a predetermined criteria and data sensed by said at least one sensor." In the following section, both Defendants propose construction of a term embedded in both of these phrases – "predetermined algorithm."  Here, the Court should construe the "means for executing a predetermined algorithm" embedded with this term consistent with Phenix's proposed means plus function construction in Section IV.B.3 above.  For the terms remaining language, "according to a predetermined criteria and data sensed by said at least one sensor,"  Phenix respectfully requests the Court construe it according to its plain and ordinary meaning as the phrase is readily understandable.

AUO's proposed alternative construction incorrectly restricts the function of the means plus function claim term.  Rather than applying the clear language of the claim itself "*optimizing said gamma reference voltage levels* using means for executing a predetermined algorithm," AUO's proposed construction restricts the function to apply only where the optimization is "based on (1) data sensed by at least one sensor and (2) the application that is being displayed, external environment such as temperature and ambient light, or the personal preference of the user."  Ex. B at Claim 1 (emphasis added); *see also* Ex. F at ¶¶ 44-47.  AUO's limitation of claim scope is contrary to the direct language of the claim itself and, therefore, runs afoul of the principles of claim construction. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir.

1998) ("The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim."). As such, Phenix requests that the Court adopt its proposed construction.

### 5. "predetermined algorithm"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Plain and ordinary meaning. | Indefinite. Alternatively, to the extent the Court decides the term is not indefinite, AUO proposes an alternative construction. *See* Dkt. 120-1 at 29-34. | Indefinite under 35 U.S.C. § 112 |

The term "predetermined algorithm" is readily understandable from its plain and meaning and needs no construction. There is no ambiguity in the term as "predetermined" and "algorithm" are commonly understood words, especially when viewed in light of the intrinsic record. For example, Claim 1 of the '788 Patent describes a "predetermined algorithm," specifically in the context of step of "optimizing said gamma reference voltage levels using means for executing a ***predetermined algorithm*** according to a predetermined criteria and data sensed by said at least one sensor, wherein said means for executing said ***predetermined algorithm*** is separate from said display to achieve the desired gamma curve." Ex. B at 7:36-38. The plain meaning of the term "predetermined algorithm" implies "a [predetermined] set of rules or procedures for solving a problem." *See Freeny v. Murphy USA Inc.*, Case No. 2:13-CV-791-RSP, 2015 WL 294102, at *25 (E.D. Tex. Jan. 21, 2015). And when the term is viewed in the context of the claim, this limitation is understood to relate to a set of rules or procedures decided in advance based on a predetermined criteria and data sensed by at least one sensor used for optimizing the gamma reference voltage levels. *Id*.; *see also* Ex. F at ¶ 49. The specification further supports this understanding. For example, the '788 Patent is directed to methods of programming an integrated circuit with a set of desired gamma correction reference voltages. Ex. B at 6:1-64. The specification gives examples

24

of the storage cells of an integrated circuit being programmed with predetermined voltage pulses. *Id*. at 6:1-31. The specification also explains that variables such as programming voltage amplitude, rise and fall time of the pulse, and pulse duration can be considered when programming the integrated circuit but "each of these variables is influenced by design and process parameters of the particular wafer fabrication facility." *Id*. at 6:32-64.

AUO's alternative constructions only serve to overcomplicate the plain and ordinary meaning of "predetermined algorithm." While AUO's construction discusses taking optical sensor data, comparing it to a gamma correction curve, and adjusting gamma reference voltage levels, it does so in overly-specific terms that only seek to import limitations not in the express language of the claim and will only serve to confuse the jury at trial. As such, Phenix requests that the Court adopt its proposed construction.

### 6. "optimizing said gamma reference voltage levels"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Plain and ordinary meaning. | n/a | Indefinite under 35 U.S.C. § 112 |

The phrase "optimizing said gamma reference voltage levels" is not indefinite and the Court should construe it according to its plain and ordinary meaning. AUO did not identify this term as one needing construction, indicating that no construction is necessary, and the term should be construed in accordance with its plain and ordinary meaning. Innolux contends that this "optimizing said gamma reference voltage levels" is indefinite.

The term "optimizing" is a well-understood term to a lay jury and a POSA would understand with reasonable certainty the phrase "optimizing said gamma reference voltage levels," when read in view of the claim language surrounding the disputed phrase and its usage throughout the specification. *See* Ex. F at ¶¶ 52. For example, in relevant part, claim 1 reads:

**optimizing said gamma reference voltage levels** using means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor, wherein said means for executing said predetermined algorithm is separate from said display **to achieve <u>the desired</u> gamma curve**

Ex. B at Claim 1 (emphasis added).

Similarly, several references are made in the specification associating optimizing gamma reference voltage levels to achieving the desired gamma refence voltage. The specification explains that integrated circuit "incorporates a programming interface to allow the programming of the buffer outputs to the desired values during manufacturing and test of the panel." *Id.* at Abstract; *see also id.* at 3:24-28 ("Once the desired voltage is found by varying the Analog Input for a particular channel….") The specification further explains that the desired gamma refence voltage is based on the user's (*e.g.*, panel manufacturer's) display requirements. *Id.* at Abstract; 2:23-28; 5:20-27; 6:54-57. Thus, a POSA would understand with reasonable certainty that, to achieve the desired gamma curve, the gamma reference voltage levels are "optimized." *See* Ex. F at ¶¶ 51-53. As such, Phenix requests that the Court adopt its proposed construction.

### 7.    "gamma reference voltage levels"

| Phenix's Construction | AUO's Construction | Innolux's Construction |
|---|---|---|
| Plain and ordinary meaning. | An analog voltage(s) stored in an analog storage cell | Analog voltage(s) stored in an analog storage cell(s) |

The Court should construe this term according to the plain and ordinary meaning. Claim 1 of the '788 Patent describe "varying gamma reference voltage levels on columns of said display by a control circuit," "optimizing said gamma reference voltage levels," and "storing said gamma reference voltage levels." Ex. B at Claim 1. The jury will understand the claim's unambiguous and straightforward use of the term "gamma reference voltage level" to refer to the amount or corresponding value of a gamma reference voltage and, therefore, the term does not require the Court's construction. *See Thorner*, 669 F.3d at 1366-67. Phenix's proposal is supported by the

intrinsic record and consistent with the Court's prior construction of "non-volatile storage cells" in the Wistron Order.[9]  *See* Ex. C at 23-28.  For example, the claims use both "gamma reference voltages" and "gamma reference voltage levels," indicating that the latter is an amount or corresponding value of former.  *See* Ex. B at Claim 1.  Further, the specification of the '788 Patent describes that display manufacturers have "the need to generate specific *gamma reference voltages* for each model of display."  *Id*. at 1:26-27.  The specification further states "[o]nce the optical sensors have modulated gamma reference voltage levels for the columns to achieve the predetermined light matching for the display these values can be saved in the gamma reference circuitry."  *Id*. at 7:1-5.  A jury would therefore understand the term based on its straightforward context.

Defendants' proposed rewording seeks to confine the "gamma reference voltage levels" to only analog voltages, carving out any potential digital form.  Defendants' experts do not dispute that generally a POSA would understand that "gamma reference voltage levels" comprise both digital and analog forms.  Ex. D at 70:1-7 (Dr. Paul S. Min Deposition Transcript); Ex. G at ¶ 153 (Declaration of Dr. Aris Silzars).  Defendants' therefore take the position—similar to their position on "non-volatile storage cells," which was previously rejected by this Court—that the term's scope should be carved out to match the alleged embodiments of the claims. Defendants' attempts are a misapplication of the law.  *See* Ex. C at 23-25.  No support exists in the intrinsic record that the patentee clearly and unmistakably disclaimed such digital embodiments and, therefore, the term should be afforded its full meaning.  *Dealertrack,* 674 F.3d at 1322.  Accordingly, Phenix requests the Court to construe the term using its plain and ordinary meaning.

---

[9] The '788 Patent is a continuation of the '305 Patent, and both patents share the same specification.

## V.    CONCLUSION

For the foregoing reasons, Phenix respectfully requests that the Court adopt Phenix's proposed constructions for the disputed terms.

Dated: June 24, 2025                          Respectfully submitted,

*By: /s/ Eric H. Findlay*
Eric H. Findlay
Texas Bar No.: 00789886
Email: efindlay@findlaycraft.com
T: (903) 534-1100
**FINDLAY CRAFT, P.C.**
7270 Crosswater Avenue, Suite B
Tyler, Texas 75703

Fabio E. Marino (Lead Attorney) *
California Bar No.: 183825
Email: Fabio.Marino@wbd-us.com
T: (408) 720-3436
**WOMBLE BOND DICKINSON (US) LLP**
1279 Oakmead Parkway
Sunnyvale, CA 94085

Steven M. Levitan *
California Bar No.:  148716
Email: Steve.Levitan@wbd-us.com
T: (408) 341-3045
**WOMBLE BOND DICKINSON (US) LLP**
50 California Street, Ste. 2750
San Francisco, CA 94111
Rodney Miller *
Texas Bar No.: 24070280
Kate Johnson **
Georgia Bar No.: 110551
**WOMBLE BOND DICKINSON (US) LLP**
1331 Spring Street, NW, Ste. 1400
Atlanta, GA 30309
T: 404-879-2435
Email: Rodney.Miller@wbd-us.com
Email: Kate.Johnson@wbd-us.com

John H. Wright III **
Illinois Bar No.: 6339840

**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Ste 1100
Raleigh, NC 27601
T: (919) 755-2155
Email: John.Wright@wbd-us.com

Daniel M. Attaway**
Delaware Bar. No. 5130
1313 N. Market Street, Ste 1200
Wilmington, DE 19801
T: (302) 252-4320
Email: Daniel.Attaway@wbd-us.com

*Admitted to the Eastern District of Texas
**Admitted Pro Hac Vice

***ATTORNEYS FOR PLAINTIFF***
***PHENIX LONGHORN LLC***

29

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 24, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing *via* electronic mail to all counsel of record.

*/s/ Eric H. Findlay*
Eric H. Findlay