# EXHIBIT H



# Transcript of Aris Silzars

**Date:** June 10, 2025
**Case:** Phenix Longhorn LLS -v- AU Optronics Corp., et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
www.planetdepos.com
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Aris Silzars
Conducted on June 10, 2025

1 (1 to 4)

```
                        1
1         IN THE UNITED STATES DISTRICT COURT
2           FOR THE EASTERN DISTRICT OF TEXAS
3                    MARSHALL DIVISION
4
5   PHENIX LONGHORN LLC,           :
6                   Plaintiff,     :
7         vs.                      : Case No.
8   AU OPTRONICS CORPORATION,      : 2:23-CV-00477-RWS-RSP
9   HISENSE ELECTRONICA MEXICO,    :
10  S.A. DE C.V., HISENSE USA      :
11  CORPORATION, HISENSE VISUAL    :
12  TECHNOLOGY CO., LTD., and DOES :
13  1-10,                          :
14                  Defendants.    :
15  _____x
16
17             DEPOSITION OF ARIS SILZARS
18                Via Zoom Videoconference
19                Tuesday, June 10, 2025
20
21  Stenographically Reported by:
22  JUSTYNE N. JOHNSON
23  RPR, CSR. No. 14301
24  Job No. 586699
25  Pages 1-87
```

```
                        2
1       The Deposition of ARIS SILZARS, was taken on behalf of
2   Plaintiff, all parties appearing remotely via Zoom
3   videoconference, beginning at 9:07 A.M., Pacific time, on
4   June 10, 2025, before JUSTYNE JOHNSON, RPR, Certified
5   Shorthand Reporter No. 14301.
```

```
                        3
1   APPEARANCES:
2
3     FOR PLAINTIFFS:
4       WOMBLE BOND DICKINSON (US) LLP
5       BY:  RODNEY MILLER, ESQ.
6       Attorney at Law
7       1331 Spring Street NW
8       Suite 1400
9       Atlanta, Georgia 30309
10      404.872.7000
11
12      WOMBLE BOND DICKINSON (US) LLP
13      BY:  JOHN H. WRIGHT, III, ESQ.
14      555 Fayetteville Street
15      Suite 1100
16      Raleigh, North Carolina 27601
17      919.755.2100
```

```
                        4
1   APPEARANCES (Continued):
2
3     FOR DEFENDANTS
4       PERKINS COIE, LLP
5       BY:  RUBEN TYLER KENDRICK, ESQ.
6       Attorney at Law
7       1301 Second Avenue
8       Suite 4200
9       Seattle, Washington 98101-3805
10      206.359.8000
11
12    ALSO PRESENT:
13      Kasey Koballa, Esquire
```

## Page 5

```
1            INDEX
2 WITNESS                         EXAMINATION
3 ARIS SILZARS
4        BY MR. MILLER.....................9
```

## Page 6

```
1            EXHIBITS
2 EXHIBIT    DESCRIPTION                     PAGE
3 EXHIBIT 1  Declaration of Aris Silzars      11
4           regarding claim construction
5           of U.S. Patent Numbers
6           7,233,305 and 7,557,788
7 EXHIBIT 2  United States Patent Number      19
8           7,223,305
9 EXHIBIT 3  United States Patent Number      22
10          7,557,788
11 EXHIBIT 4 Joint claim construction and     42
12          prehearing statement
```

## Page 7

1  June 10, 2025 | 9:07 A.M.
2
3
4      EXHIBIT TECHNICIAN: Thank you to everyone for
5  attending this proceeding remotely, which we anticipate
6  will run smoothly. Please remember to speak slowly and do
7  your best not to talk over one another. Please be aware
8  that we are recording this proceeding for backup purposes.
9      Any off-the-record discussions should be had away
10 from the computer, and please remember to mute your mic
11 for those conversations. Please have your video enabled
12 to help the reporter identify who is speaking. If you are
13 unable to connect with video and are connecting via audio
14 alone, please identify yourself before speaking.
15     We will provide a complimentary unedited
16 recording of this proceeding with the purchase of a
17 transcript. And I apologize in advance for any possible
18 technical-related interruptions. Thank you.
19     THE STENOGRAPHER: Good morning. We are going on
20 the record at 9:07 a.m. on Tuesday, June 10, 2025, in the
21 matter of Phenix Longhorn, LLC, v. AU Optronics
22 Corporation, et al., Case Number 2:23-cv-00477-RWS-RSP.
23 Today's deposition is taking place remotely via Zoom
24 videoconference.
25     My name is Justyne Johnson. I am a California

## Page 8

1  certified shorthand reporter representing the firm Planet
2  Depos, and my certification number is 14301. The deponent
3  is Dr. Aris Silzars.
4      Counsel, can you please introduce yourselves?
5      THE WITNESS: I'm sorry. Say that again?
6      THE STENOGRAPHER: I asked counsel to introduce
7  themselves.
8      THE WITNESS: Okay. It's Aris, A-r-i-s, Silzars,
9  S-i-l-z-a-r-s.
10     MR. MILLER: Counsel for Phenix long -- Longhorn,
11 LLC. My name is Rodney Miller of Womble Bond Dickinson,
12 LLP.
13     MR. WRIGHT: This is John Wright of Womble Bond
14 Dickinson on behalf of Plaintiff, Phenix Longhorn, LLC.
15     MR. KENDRICK: Ruben Tyler Kendrick on behalf of
16 Defendant AUO Corporation, the witness.
17     MS. KOBALLA: Kasey Koballa of Kilpatrick on
18 behalf of the Hisense defendants.
19     THE STENOGRAPHER: Dr. Silzars, can you raise
20 your right hand, please?
21
22         ARIS SILZARS,
23 having first been sworn by the Certified Shorthand
24 Reporter, was examined and testified as follows:
25     THE WITNESS: I do.

## 9

1  THE STENOGRAPHER: Please proceed, Counsel.
2
3           EXAMINATION
4  BY MR. MILLER:
5    Q  Good morning or good afternoon, Dr. Silzars. Can
6  you -- can you, again, please state your full name for the
7  record?
8    A  Aris, A-r-i-s, Silzars, S-i-l-z-a-r-s.
9    Q  And I just want to confirm, have you been deposed
10 before?
11   A  Yes.
12   Q  And have you been deposed before remotely?
13   A  Yes. Yeah. By the way, one thing with regard to
14 being deposed remotely, the speakers on my laptop are not
15 the greatest. And so to the extent that you can speak
16 clearly and speak up, it will help. If I do have a
17 problem, I'll let you know if I don't understand a
18 question. But right now, I'm doing okay. But you
19 could -- you could go a little bit louder, if you can.
20   Q  Okay. Thank you very much. You know, I
21 appreciate -- I appreciate your ground rules. And I kind
22 of -- I echo that sentiment to you.
23   A  Right now, it's sounding better -- it's sounding
24 okay.
25   Q  Okay. So I turned my volume up and I -- so I

## 10

1  just, for you as well, you know. I can -- I can hear you
2  a little bit. I put my speaker volume up to about 80.
3  So, you know, hopefully, you know, we can talk to each
4  other.
5    A  Yeah. Right now, we're doing okay. If we're --
6  if I'm not understanding a question or missing something,
7  I'll ask you to repeat, which I hope won't be too
8  frustrating.
9    Q  All right. So, again, you're a seasoned veteran
10 in this. We -- I will ask you questions. And I will --
11 I'm assuming that, you know, give your counsel an
12 opportunity to object if necessary. But then you, in
13 turn, will answer that particular question. And, you
14 know, because it's remote, I just repeat again that, you
15 know, just be as clear as possible.
16       And you understand, Dr. Silzars, that, you know,
17 you're here to testify about -- about some -- about a
18 declaration that you submitted in the Phenix Longhorn v.
19 AU Optronics and Hisense litigation that's pending in
20 Eastern District of Texas; correct?
21   A  Yeah, that's correct.
22       MR. MILLER: Okay. So we're going to -- I want
23 to pull up Mr. Silzars [sic] -- his declaration. Can we
24 pull that up?
25       EXHIBIT TECHNICIAN: Yes, so the declaration is

## 11

1  for the claim construction?
2        MR. MILLER: Yes, sir.
3        EXHIBIT TECHNICIAN: And we will be marking it as
4  Exhibit 1?
5        MR. MILLER: Yes, we will be marking as
6  Exhibit 1.
7        EXHIBIT TECHNICIAN: All right. It will be on
8  the screen in a moment.
9        (Exhibit 1 was marked for identification by the
10 Certified Shorthand Reporter and is attached hereto.)
11       (Exhibit 1, page 1, was displayed.)
12 BY MR. MILLER:
13   Q  All right. Mister -- or sorry. Dr. Silzars, do
14 you recognize this as the cover page of this document?
15   A  Yes. I'm just comparing it to my clean copy
16 here. And -- yes. That's -- that's my declaration.
17   Q  Which -- if we were in person, I'd ask to see a
18 copy of your clean copy that you have.
19   A  I -- I'm sorry. Now, I didn't get the last thing
20 you said.
21   Q  I said if we were in person, I would ask to see a
22 copy of your clean copy to make sure we're looking at the
23 same thing.
24   A  Yes. I do have a clean copy in front of me. I
25 have the declaration and the patents that are also clean

## 12

1  copies. So...
2    Q  And just the ground rules. Do you recognize this
3  document?
4    A  Yes.
5    Q  This exhibit?
6        All right. And what is it?
7    A  The document -- it's my declaration regarding the
8  claim construction on the patent '305 and '788.
9    Q  And can we turn to page 65 of that document, of
10 Exhibit 1?
11       (Exhibit 1, page 65, was displayed.)
12 BY MR. MILLER:
13   Q  I just want to confirm, Dr. Silzars, that's
14 your -- that's your date and your signature on the last
15 page?
16   A  Yes, it is.
17   Q  And do you believe when you signed this
18 declaration that it was complete and accurate?
19   A  Yes.
20   Q  And by signing, you were agreeing with and
21 adopting the opinions that are in the declaration;
22 correct?
23   A  I -- I'm sorry. Could you repeat that?
24   Q  And by signing, you were agreeing with and
25 adopting the opinions that are in the declaration?

**49**

1 information that was provided to me earlier in the report
2 in describing how a "means plus function" term should be
3 analyzed. So I simply applied the detailed knowledge that
4 was provided to do the analysis. So given the explanation
5 of how the process works, I simply applied it in using
6 common understanding, not particularly making an
7 assumption that I had to be a legal expert in order to
8 understand the language.
9 BY MR. MILLER:
10   Q   All right, Dr. Silzars, but the conclusion as to
11 whether or not that term is a means plus function is a
12 question of law; is that correct?
13       MR. KENDRICK: Object to the scope.
14       THE WITNESS: Well, it's a question of
15 interpretation. And I suppose with everything in my
16 declaration, at some point, the Court is going to decide
17 if my analysis is correct or not. So I'm proposing an
18 analysis and I'm proposing an interpretation that I
19 believe to be valid. Eventually this decision will have
20 to be made by the Court, and that is the actual
21 interpretation of the law. I can propose an
22 interpretation and I can propose an analysis. But the
23 final say is in the Court.
24 BY MR. MILLER:
25   Q   Going to walk through some of these terms here

**50**

1 that you've offered an opinion on, Dr. Silzars.
2       MR. KENDRICK: Rodney, just give -- before you do
3 that, can I suggest a break. We've been going about an
4 hour since the short break we had. And so I don't know if
5 you're going to now switch to plaintiff terms. It may be
6 helpful to have a short break here so Aris can use the
7 bathroom, et cetera.
8       MR. MILLER: That's fine. How long you want? 15
9 minutes?
10       MR. KENDRICK: 10, 15 work for me.
11       MR. MILLER: Let's do 15.
12       MR. KENDRICK: Okay. 15.
13       MR. MILLER: Let's go off the record.
14       THE STENOGRAPHER: Off the record at 10:22 a.m.
15       (Off the record.)
16       THE STENOGRAPHER: Back on the record at 10:35
17 a.m. Please proceed.
18 BY MR. MILLER:
19   Q   Welcome back, Dr. Silzars.
20       All right. Dr. Silzars, do you know what a
21 control circuit is?
22   A   A control -- many things can be a control
23 circuit. It's kind of a generic, broad term that could
24 apply to -- a light switch is a control circuit. A
25 complex device that, as I mentioned -- that takes various

**51**

1 inputs for your flat panel television and routes them to
2 the right place. That can be a control circuit. So
3 it's -- it -- we have to define what we mean by it. But
4 in general, a control circuit is a circuit that controls
5 something.
6   Q   And in that same paragraph 73, page 26 of your
7 report --
8       (Exhibit 1, page 29, was displayed.)
9       MR. MILLER: -- just going to go to the number 1
10 in there. You said, "The term control circuit represents
11 an extremely broad class of structures."
12       What do you mean by "broad class of structures"?
13   A   Just, for example, what I just mentioned, that a
14 light switch is a structure. It controls something. It
15 controls light coming on and off. A complicated circuit
16 board that controls many functions coming into a flat
17 panel TV and then selects how they're routed to the
18 television. That can be control -- considered a control
19 circuit. The control circuit is one that we have to
20 define, otherwise it's just what I said. It's a circuit
21 that controls something typically electrical.
22   Q   So it's a circuit that controls something
23 electrical. Is that a structure?
24   A   Is that -- is that what -- what was the last
25 part?

**52**

1   Q   Let me repeat the question again. Is a circuit
2 that controls -- is that a structure?
3   A   Is that a structure?
4   Q   Yes. A circuit that controls, is it a structure?
5   A   I think the last word you're using is
6 "structure." And it -- well, certainly in the common
7 usage, a circuit -- a control circuit is -- the circuit
8 itself implies a structure in the common usage in
9 electrical engineering. If I tell you that I have a
10 circuit, I'm referring to something that is -- that I can
11 look at; something I could, you know, it may be a portion
12 of something, but it is a thing.
13       So a control circuit in typical usage would be a
14 thing. It would be a structure. It's something that we
15 can identify as -- and point to. It's not a -- some
16 esoteric concept. It's a circuit. A circuit is a
17 circuit. It's something we can hang -- we can look at and
18 analyze.
19   Q   Dr. Silzars, by any chance, do you recall when
20 you -- when you reviewed the -- the Wistron claim
21 construction order? Do you recall reviewing the Court's
22 analysis on circuits for programming?
23   A   I recall reading them, but I don't -- do not
24 recall the specifics of what that said.
25   Q   And in drafting this section on control circuits,

**Page 61**

report. When I'm asked to do an analysis, I make that as an independent analysis based on my expertise and based on my understanding of the technology.

I may use other references. I may look at other constructions. But the end result is my work, is my -- is based on my conclusions and based on my analysis. And I've presented them in considerable detail in my declaration. So I have gone through and presented all of the reasoning behind my analysis. So it stands independent of references.

BY MR. MILLER:

Q   All right. So Dr. Silzars, so you're saying that you can come up with a declaration for claim construction and you could propose claim constructions that are different or inconsistent from the claim constructions that your client is proposing?

MR. KENDRICK: Objection to the extent it mischaracterizes testimony. Object to form. Object to scope.

THE WITNESS: First of all, I did not say that they were inconsistent.

BY MR. MILLER:

Q   No. That's --

A   The client has proposed several options -- different opportunities, different possible

**Page 62**

interpretations. I'm not in disagreement with any of those that the client has proposed. However, what I am presenting in my declaration is a conclusion that is based on a very thorough analysis. And that conclusion leads to a specific outcome. And that is what I am offering to the court as the best possible interpretation of how these terms should be treated.

Q   Okay. So is it possible that you can do an independent analysis and come up with a construction that is different from the proposed construction of Hisense and AUO?

MR. KENDRICK: Objection. Scope. Objection. Form.

THE WITNESS: As I said, it looks like the client has proposed some alternatives. I have done the analysis independent of those proposed alternatives. And my conclusion is that those alternatives are not necessary.

BY MR. MILLER:

Q   So do you agree or disagree with your client's alternative construction?

MR. KENDRICK: Objection. Scope. Form. Asked and answered.

THE WITNESS: I've mentioned several times now, it's not a disagreement. It's a different approach in doing a thorough analysis. I don't disagree with what the

**Page 63**

client has proposed. So you keep using the term "disagree." I don't think that's an appropriate way to suggest what I'm saying.

MR. MILLER: We're going to jump to page 40. The gamma reference control capability.

MR. KENDRICK: Is that page 40 of Exhibit 1, Counsel?

MR. MILLER: Yes. Sorry. Page 40 of Exhibit 1, Dr. Silzars's declaration. Look at gamma reference control capability.

BY MR. MILLER:

Q   Similar to the other one, I just want to confirm, Dr. Silzars, you did not take into account in your analysis your client's propo -- sorry, your client's alternative construction as related to gamma reference control capability in your analysis; is that correct?

A   That's correct.

MR. KENDRICK: Objection.

THE WITNESS: I'm just mentioning one more time that there is nowhere in my declaration that I have -- other than the list that's been provided where I have done any comparison or analysis and reliance on a client's construction.

THE STENOGRAPHER: And what was the objection?

MR. KENDRICK: Scope and form. Thanks, Justyne.

**Page 64**

BY MR. MILLER:

Q   And Dr. Silzars, just trying to get a -- just a general understanding of your opinion on gamma reference control capability and why you believe that is indefinite.

A   Because there is no explanation either in the claim itself or in the specification as to what one might think a control capability is. It can be many things and the specification is -- says nothing about it. And the claim does not explain what is meant by a control capability.

Q   So when you did your analysis for control capa- -- gamma reference control capability, did you -- how did you perform that analysis? Did you simply search for that particular term in the specifications or did you actually analyze the specifications to determine whether or not --

A   No.

Q   -- you had (indiscernible) --

A   Well, certainly -- of course, no, I analyzed the specifications. There's no mention of a control capability in the specification. There's certainly reference to -- there's certainly quite a discussion about gamma and gamma reference. But nothing about what is meant by "control capabilities." So if we were to -- if we were to look at a product that possibly practices this

**65**

1  patent, we would really have no idea what to point to as
2  identifying the structure that it (video interference) --
3      Q   All right.  Dr. Silzars, let's look at --
4      A   -- full capability.
5      Q   Let's look at the patent -- let's go to the '788
6  patent.
7          MR. MILLER:  Can we pull up Exhibit -- it's
8  Exhibit 3.
9          And we're going to go to -- it should be the back
10 of Exhibit 3, the end of Exhibit 3.  It should be starting
11 in the (audio interference) --
12         THE STENOGRAPHER:  I'm sorry?
13         MR. MILLER:  It's starting in column 7.  Slide
14 down.  Let's take a look at -- you said, "We claim:  1."
15         (Exhibit 3, page 11, was displayed.)
16 BY MR. MILLER:
17     Q   All right.  So we're going to look at claim 1A
18 and we'll look at claim 1E.  The claim reads, in part,
19 "providing said display with gamma reference control
20 capability which is electronically reprogrammable and
21 non-volatile."
22     A   Are you reading the se- -- the phrase "E" when
23 you just --
24     Q   (Indiscernible) --
25     A   -- read that?

**66**

1      Q   I'm looking at 1A.  Looking at limitation 1A.
2      A   Oh, 1A.
3      Q   Yes, sir.
4      A   Okay.  I thought you were also down back at E.
5  Okay.
6          Okay.  I have read that.  Please restate your
7  question.
8      Q   I said which -- by 1A, "providing said display
9  with gamma reference control capability which is
10 electronically reprogrammable and non-volatile."  And then
11 we can go to 1E.  It says, "storing said gamma reference
12 voltage levels in said gamma reference control
13 capability."
14         And so, Dr. Silzars, from looking at this,
15 "providing said display with gamma reference control
16 capability which is electronically reprogrammable and
17 non-volatile," would you say that the way it's described
18 in that claim that the gamma reference control capability
19 is a structure?
20     A   No.
21     Q   Why not?
22     A   There's no structure described here.
23 Electronically reprogrammable and non-volatile is not a
24 structure.  That's a function.
25         THE STENOGRAPHER:  Counsel, can we go on a brief

**67**

1  break, please?
2          MR. MILLER:  Sure.
3          THE STENOGRAPHER:  Off the record at 11:05.
4          (Off the record.)
5          THE STENOGRAPHER:  Back on the record at
6  11:11 a.m.  Please proceed.
7  BY MR. MILLER:
8      Q   All right.  Dr. Silzars, we're go -- Dr. Silzars,
9  we're going back to -- we're at claim 1A.  We're looking
10 at claim 1E of the 7A [sic].  And I'm just trying to get
11 your understanding of why you believe gamma reference
12 control capability is a function and not a structure.
13         MR. KENDRICK:  Object to the form.
14         THE WITNESS:  Okay.  Please, if you had a
15 question, I didn't get it.  I -- I'm back to claim 1.  And
16 I think you said claim 1E, like "echo."
17 BY MR. MILLER:
18     Q   Claim 1A.  (Indiscernible.)
19     A   1A.  Okay.  Like "apple."
20     Q   You can start with 1A, though.  Start with 1A.
21     A   Okay.  There is no structure disclosed in this
22 1A.  It's -- it talks about gamma control capability which
23 is electrically reprogrammable and non-volatile.  Well,
24 electrically reprogrammable and non-volatile are
25 functions; they're not structures.

**68**

1      Q   All right.  So you're saying that "which is
2  electronically reprogrammable and non-volatile," it is
3  your opinion that those are functions and that those
4  functions that are then tied to the claim limitation gamma
5  reference control capability, are you saying that that's a
6  function as well?
7          MR. KENDRICK:  Object to the form.
8          THE WITNESS:  Yes.  Control capability has no
9  structure associated with it.
10         MR. MILLER:  Okay.
11         THE WITNESS:  When we talk about something being
12 electronically reprogrammable, what -- tell me what it is.
13 There's hundreds of ways to make something electrically
14 reprogrammable.  And non-volatile, that's just a function.
15 Something is either volatile or non-volatile.
16         MR. MILLER:  Right.
17         THE WITNESS:  It doesn't tell me what that might
18 be.  So when you talk about -- that we have a gamma
19 reference control capability, we still have no idea what
20 that structure might be.  And if we were to try to analyze
21 a product to see if it practices the invention, we could
22 point to almost anything.  And say, "Well, that's control
23 capability."  It's indefinite.
24         There's no particular structure identified in the
25 specification.  And there's no structure that we can point

---

**Page 69**

1 to in the claim that says, "Oh, yes, that's what that
2 might mean." So it's not even mentioned in the patent
3 specification. So we don't have anything to rely on.
4 So --
5  Q  Okay. I'm going to ask you --
6  A  -- basically have a function here with an
7 indefined -- undefined structure.
8  Q  All right. So I'll take that. So -- disagree
9 with it -- we agree to disagree.
10      All right. So let's say -- okay. So you say in
11 looking at that, the gamma reference control capability
12 specifically as it relates to claim 1A is "providing said
13 display with gamma reference control capability," and then
14 1E that says "storing said gamma reference voltages levels
15 in said gamma reference control capability."
16      And in looking at the claims, did you review the
17 specifications to determine whether there was a structure
18 disclosed in the specification that related to that?
19  A  I did look at the specification in great detail,
20 and that term is not mentioned in the specification, as
21 far as I could find.
22  Q  By any chance, did you look in the specifications
23 and give an example because they are an exemplary
24 embodiment? Did you look at the embodiment in figure 3
25 that it's just a gamma reference controller 300?

**Page 70**

1  A  Yes.
2  Q  Why is that not providing said display with --
3 why -- capable -- why -- let me back up. Why is the gamma
4 reference controller not a structure which --
5  A  Because it's not a gamma reference control
6 capability. I don't know what capability it's supposed to
7 be. A gamma reference controller is an -- actually, as
8 it's shown in the patent, is at a very high level. It's
9 what I -- I think the patent even calls it an
10 architectural depiction. It's -- it consists of quite a
11 few circuits. But that's not -- that doesn't tell us what
12 control capability might be. That could be something much
13 broader. It could be something else. It just doesn't --
14 it doesn't say.
15  Q  So could it be the gamma reference control --
16      MR. KENDRICK: Objection.
17 BY MR. MILLER:
18  Q  -- 300?
19      MR. KENDRICK: Sorry. Objection. Form.
20      THE WITNESS: I just missed the last part of what
21 you said.
22 BY MR. MILLER:
23  Q  I'm asking you, 'cause, I mean, you said you
24 looked at the specifications. I'm just curious if you
25 just considered that -- whether the gamma reference

**Page 71**

1 controller 300, based on what you're saying. You're
2 saying it's a function. You're saying gamma reference
3 control capability is a function. Could the gamma
4 reference controller 300 that's in figure 3 be a
5 structure?
6  A  The specification does not anywhere describe or
7 use the term "control capability." So we are left to
8 guess at what that might mean. And in terms of patent
9 analysis and analyzing whether an invention practices a
10 patent, we shouldn't -- we're not allowed to guess and
11 say, "Well, I think it means this." There are
12 possibilities --
13  Q  So --
14  A  -- that it could be, but --
15  Q  But --
16  A  -- we don't know that.
17  Q  (Indiscernible.)
18  A  We're not -- with the specification and the claim
19 indefinite, we can't just start gluing something together
20 hoping that we get the right answer.
21  Q  So as a person of ordinary skill in the art, is
22 your opinion because -- what? -- the patent says control
23 capability that it's indefinite?
24  A  Yes.
25      THE STENOGRAPHER: I'm sorry. Was there an

**Page 72**

1 objection?
2      MR. KENDRICK: Form.
3 BY MR. MILLER:
4  Q  So if the patent said "providing said display
5 with gamma reference controller which is electronically
6 reprogrammable and non-volatile," would that work for you,
7 Dr. Silzars? Would that not be indefinite?
8      MR. KENDRICK: Objection. Scope. Objection.
9      THE WITNESS: I would --
10      MR. KENDRICK: Incomplete hypothetical.
11      THE WITNESS: That -- yeah. That is a
12 hypothetical, and I'm not prepared to respond to something
13 that I haven't had a chance to analyze.
14 BY MR. MILLER:
15  Q  Well, I'm asking you because you are an expert.
16 You graduated from law school [sic] in '67. You have all
17 this experience and you consider yourself (indiscernible)
18 and you offered a declaration. So you analyzed the
19 specification.
20      The specification discusses a gamma reference
21 controller 300. And I'm just curious, in your analysis,
22 could you say, from looking at that, if it said "providing
23 said display with a gamma reference controller," which the
24 patent describes as something that could be electronically
25 reprogrammable and non-volatile, whether that right --

---

**Page 73**

whether the inclusion of that term in limitation 1A, whether you believe that would be indefinite?

MR. KENDRICK: Objection. Form. Objection. Incomplete hypothetical. And just for the record, Dr. Silzars has not graduated from law school.

MR. MILLER: I apologize.

THE WITNESS: Okay.

MR. MILLER: He got his Ph.D. in 1967. My fault. Correct the record on that.

THE WITNESS: I'm not prepared to try to repair the patent.

BY MR. MILLER:

Q So I'm going to ask again, Dr. Silzars. We asked this -- so I have to ask you. Did you take into account your client's alternative construction for gamma reference control capability when performing your analysis on this term?

A I did not.

MR. KENDRICK: Objection. Scope. Asked and answered.

MR. MILLER: Counsel, it's not an asked and answered because it's a different term. But I'll let you keep objecting. It's fine.

MR. KENDRICK: Thank you.

///

---

**Page 74**

BY MR. MILLER:

Q Okay. Dr. Silzars, as a person of ordinary skill in the art, are you familiar with the term "gamma reference voltage levels"?

A Gamma reference voltage, and was there another word?

Q Term "gamma reference voltage levels."

A Yes.

Q What is your --

A I'm familiar with the term in the context of this patent.

Q I'm asking you, are you familiar with this term period, "gamma reference voltage levels"? Have you heard of that term prior -- for a person of ordinary skill in the art at the time of the invention, have you ever heard of gamma reference voltage levels at the time of the invention?

MR. KENDRICK: Object to the form.

THE WITNESS: Sure. And it's certainly whenever we're working with gamma control, that would be a likely term to come up, that you would have some kind of a gamma reference curve that you might want to use and that that would be used in programming whatever display that you're working on. So yes, the -- in general, anything to do with gamma reference, gamma voltage, gamma curves, those

---

**Page 75**

would all be terms that might come up in the process of working on a flat panel display.

BY MR. MILLER:

Q Voltage levels can be represented as analog signals and digital signals; correct?

A Okay. I'm sorry. You're going to have to slow down your question or speak more clearly. Some -- I'm missing too much of it. I can't answer something if I don't know what you asked.

Q Voltage levels can be represented as analog signals and digital signals; correct?

A Voltage level --

MR. KENDRICK: Objection. Form.

THE WITNESS: -- would typically be expressed as an analog. A digital signal is expressed as a sequence of pulses. So when we talk about a voltage level, a voltage level can be digitized. We can convert it to a digital signal. But a digital signal itself would not be discussed in terms of voltage levels.

THE STENOGRAPHER: And was that --

THE WITNESS: They're basically 1s and 0s. It's a sequence of pulses. So it would depend on the context, if I'm working in the digital domain, I could certainly think in terms of expressing voltage levels in the digital domain. But I wouldn't normally talk about a digital

---

**Page 76**

level as being a voltage level.

BY MR. MILLER:

Q All right. So can gamma reference voltage levels be expressed as digital representation?

A They can be --

Q A digital --

A -- converted to a digital sequence of pulses. If we go from an analog signal, we can go through a digital to analog converter -- analog to digital converter first so we can convert an analog signal into a digital signal. And then at some point, when we've actually operate the display, it has to be converted back to an analog signal.

The columns on the display work on the basis of an analog signal always. There -- they are not -- they cannot be -- if you address some of the digital signal, you get 1s and 0s, which would be either all on or all off.

If you want gray scale, we have to analog signals on the columns of the display, which then typically means that the input that we would normally operate the display on also has to be analog. So if we want to have a digital version of that, we would have to convert the analog signal to digital pulses. And then for operating the display, we would have to convert it back to analog.

Q So I'm going to ask this and say again. Gamma

**77**

1  reference voltage levels, can they include a digital
2  representation of -- can they include a digital
3  representation?
4     A   I just tried to provide the explanation that if
5  you just talk about gamma reference voltage level, that
6  implies an analog signal. And I said if you want to go
7  through a rather complicated path, you can convert that
8  analog signal to digital and then convert it back to
9  analog for operating the display. That's, you know, a
10  three-step process basically.
11       So when we talk about gamma voltage reference
12  level, I cannot imagine a situation of where you would
13  consider that to be in the digital domain.
14     Q   Why is that?
15     A   Because we're operating a display that runs in an
16  analog mode. That gamma correction is going to be
17  presented to the columns of the display. The columns of
18  the display cannot be digital. They have to be analog in
19  order to do gray scale. That's absolutely -- that's not
20  up for discussion.
21       If we want to have a gray scale display, if we
22  want to put up a color image on it, it has to be analog.
23  So any kind of gamma voltage correction that we want to
24  present to the columns has to be in analog form. I cannot
25  put a digital gamma correction signal onto the columns of

**78**

1  the display and have an operating display.
2     Q   I'm going to speak to on the non-volatile storage
3  cells. Dr. Silzars, what's a non-volatile storage cell?
4     A   I heard the first part. You said what is the
5  non-volatile storage --
6     Q   (Indiscernible.)
7     A   -- and then what? What was the last word?
8     Q   What is a "nonvolatile storage cell"?
9     A   Cell? Is that the last word?
10     Q   Yes, sir. Cells from the -- from the cells.
11  Yes.
12     A   Yeah.
13     Q   Cell.
14     A   It's typically a -- it's a -- just the term
15  "non-volatile storage cell" is simply a memory cell that
16  can retain information af- -- without power having to be
17  connected to it.
18     Q   Can a non-volatile storage cell retain both
19  digital and analog information?
20     A   It is possible to have a nonvolatile storage cell
21  in either analog or digital format. However, those two
22  are not compatible with each other. I suppose if I -- it
23  can be in one way. An analog non-volatile cell can
24  contain a 1 or a 0. So it can actually represent digital
25  information, and it can also represent analog information.

**79**

1       A digital non-volatile cell, on the other hand,
2  can only represent a 1 or a 0. It cannot represent
3  anything in between. And that's really just by
4  definition. If I have a digital cell, it's just going to
5  be 1 or 0, and nothing in between.
6     Q   Dr. Silzars, in your analysis of non-volatile
7  storage cells, in paragraph -- so, you know, specific one
8  I want to talk about -- in paragraph 156 in your
9  discussions, you have discussions on --
10     A   I'm sorry, which paragraph?
11     Q   Paragraph 156.
12     A   Oh. 156. Okay.
13     Q   Paragraph 156. You have a discussion and it
14  continues on. And you have an opinion on whether or not
15  you believe that the named individual of '305 patent or
16  whether the '305 patent taught away from using the digital
17  solution. I'm just trying to confirm, you're not a legal
18  expert; right?
19     A   My -- yes. My conclusions in my deposition -- I
20  mean, declaration, excuse me, is that in analyzing this
21  patent, the only possible non-volatile storage cells have
22  to be analog, based on how the patent is only -- only
23  describes analog cells, but also the fact that if we try
24  to replace that analog cell with a digital cell, the
25  device will not operate.

**80**

1     Q   What do you mean by "the device will not
2  operate"?
3     A   If the analog cell as described in the patent
4  allows the storage of ten 24 levels. And if we wanted to
5  now replace that analog cell with a digital cell, a
6  digital cell can only represent a 1 or a 0. In order to
7  have ten 24 levels, we need -- for every analog cell, we
8  would have to replace it with 10 digital cells in order to
9  get the 10-bit accuracy that ten 24 levels represents.
10       So we would have to do several things in order to
11  create an operating device that would be quite different
12  than what's described in the patents.
13       We would have to first take the analog input
14  signal, which is what the patent describes as using. We
15  would have to convert it in an analog-to-digital converter
16  into a digital stream. Then that digital stream would
17  have to go into memory that is digital. And for every
18  analog cell, we would now have to replace it with 10
19  digital cells. And then on the other end, we would have
20  to have a digital analog converter that then feeds into
21  the columns.
22       That is very different than anything that is
23  contemplated or described in the patents. And if we only
24  take the approach of replacing the analog cell with a
25  digital cell, as I said, we end up with a nonoperating

81

1  device. It cannot represent gray scale. It could only
2  turn the display fully on or fully off. And that was not
3  the intent of the invention as presented in the patents.
4     Q  You say you're qualified to say -- to speak on
5  the intent of the invention?
6     A  Please repeat your question. I'm sorry. I'm
7  having trouble understanding.
8     Q  So are you qualified to speak of the -- to speak
9  on the intent of the invention?
10    A  Oh, I -- to the extent that this would be totally
11 different than anything the patent contemplates, yes, I
12 think I am qualified to speak on that. I mean, I know
13 that -- I've read the specification. I've read the
14 claims. I know what the patent's about. So if the
15 inventors wanted to provide or patent a digital version,
16 they sure could have done that.
17    But they didn't do that. They patented an
18 entirely analog process. And in describing and patenting
19 that process, they have presented a structure that cannot
20 be converted to digital using the layout that they have.
21 It is impossible to replace the analog cells with digital
22 cells and have anything that resembles an operating
23 device.
24    Q  So Dr. Silzars, is your analysis tied to the
25 embodiments that are disclosed inside of the

82

1  specifications only?
2     A  Did my analysis do -- yeah. I can't -- you're
3  way far away. You're behind your name.
4     Q  (Indiscernible.)
5     A  I can't see your face. If you want to do
6  something different here.
7     Q  Let me repeat --
8     A  I'm not getting your questions.
9     Q  I'm trying -- you're talking over me now. I'll
10 say it again. Is your analysis limited to the embodiments
11 that are disclosed in the patent?
12    A  My analysis is limited to the specification and
13 to the claims. And if the claims -- the claims can -- the
14 specification is typically exemplary embodiment. There
15 can be others. So to the extent that the claims could
16 encompass embodiments that are different or an expansion
17 of what's -- what the exemplary claims are, the claims
18 take precedence. So the specification describes preferred
19 embodiments. But the claims are usually what is
20 considered the final word in terms of what the invention
21 encompasses.
22    Q  All right. So where in the claim, claim 1 of the
23 '305, would you say that claim 1 is limited to analog?
24        MR. KENDRICK: Object to the form.
25 ///

83

1  BY MR. MILLER:
2     Q  Specifically as it relates to the non-volatile --
3     A  I just pulled up claim 1 of the '305
4  (indicating).
5        Well, first of all, in terms of plurality of
6  inputs, we have to rely on the specification that those
7  are analog inputs. A digital signal would not be a
8  plurality of inputs. And then the claim of -- then we
9  have drivers connected to said storage cells and the
10 plurality of outputs. Of course those go to the display.
11 And that is a purely analog signal. So we cannot have a
12 digital signal on the display.
13       So we have an input that's been described as
14 analog, and we have an output that has to be analog. And
15 then, of course, it mentions the plurality of influx
16 connected to the multiplexer. There's nothing in here
17 that would indicate the conversion to a digital signal.
18 So that would indicate it's all analog.
19       And the fact that the gamma voltage signals,
20 those would be analog. And that's -- then the rest is
21 simply talks about banks of gamma reference voltage signal
22 display conditions. So there -- it's very clear that
23 claim 1 only contemplates an analog signal. And as I
24 described, if you try to play the game of replacing those
25 cells with a digital cell, it just doesn't work. It can't

84

1  make it -- can't make it work.
2     Q  And I'm going to repeat. Why couldn't it work?
3  Is it because of the connection language?
4     A  Oh, it's -- if you convert those to digital
5  cells, you cannot get gray scale. As I said, the -- it --
6  there is no possible alternative to driving the columns in
7  anything other than an analog mode. So we have to have an
8  analog signal going to the columns. And everything that's
9  described here simply shows how we get from an input to
10 storage to providing the signal to the display.
11    Q  Okay. I'm going to ask: Does the information
12 that you just provided there -- do you have that included
13 inside of your declaration?
14    A  I've given you more details in my explanation
15 right now. But where I mention that very briefly in my
16 declaration was in paragraph 164. And it said, "detailed
17 programming methodology involving incremental voltage
18 adjustments, realtime monitoring, and close-loop
19 verification is, in my opinion, incompatible with digital
20 storage and only functions with analog memory cells."
21       So I said it. Maybe I should have expanded on it
22 further. But I said it's incompatible with digital memory
23 cells. So that's the same as my more elaborate
24 explanation that I've just been providing.
25    Q  Okay. Thank you very much. I'm going to ask

85

1  this. I'm going to go back to a question that I asked
2  earlier that was -- kind of went away from that. But I'm
3  just curious. You do have an analysis in here that
4  relates to non-volatile storage cells where you are
5  discussing the '305 patent teaching away from the use of
6  digital solution. And I just wanted to know from you, are
7  you qualified to give an opinion as to whether or not the
8  patent teaches away a solution?
9     A  **Well, in doing the -- analyzing what was in the**
10 **'305 patent, I did note that the inventors were teaching**
11 **really away from a digital solution as being too complex**
12 **and too expensive. So that was really to provide a sense**
13 **of what the inventors were thinking and describing when**
14 **they were creating their invention as an analog device.**
15    Q  All right. Dr. Silzars, let's just --
16       MR. MILLER: I'm going to take a quick break.
17 Counsel, can we go off the record?
18       THE STENOGRAPHER: Off the record at 11:44 a.m.
19       (Off the record.)
20       THE STENOGRAPHER: Back on the record at
21 11:49 a.m. Please proceed.
22       MR. MILLER: All right. Counsel, we pass
23 Dr. Silzars.
24       MR. KENDRICK: I have -- I'm sorry, Rodney. Say
25 again.

86

1       MR. MILLER: I'm passing him. Do you have
2  anything?
3       MR. KENDRICK: No questions from us.
4  Kasey?
5       MS. KOBALLA: No. Nothing from me.
6       MR. KENDRICK: Okay. All right.
7       MR. MILLER: Dr. Silzars, thank you very much for
8  your time.
9       And we can go off the record.
10      THE STENOGRAPHER: Off the record at 11:50 a.m.
11      (Time noted 11:50 a.m.)
12
13              ---o0o---
14
15
16
17
18
19
20
21
22
23
24
25

87

1                    )
2  STATE OF CALIFORNIA    )
3                    )
4        CERTIFICATE OF REPORTER
5     I, JUSTYNE N. JOHNSON, do hereby certify that the
6  witness in the foregoing deposition was by me duly
7  affirmed to tell the truth, the whole truth and nothing
8  but the truth in the within-entitled cause; that said
9  deposition was taken at the time and place therein stated;
10 that the testimony of said witness was reported by me and
11 was thereafter transcribed under my direction and
12 supervision; that the foregoing is a full, complete and
13 true record of said testimony; that the witness was given
14 an opportunity to read and, if necessary, correct said
15 deposition and to subscribe the same.
16    I further certify that I am not of counsel or
17 attorney for any of the parties in the foregoing
18 deposition and caption named, or in any way interested in
19 the outcome of the cause named in said caption.
20    IN WITNESS WHEREOF, I have hereunto set my hand
21 this 10th day of June, 2025.
22
23
24  _*Justyne Johnson*_____
25  JUSTYNE N. JOHNSON, CSR NO. 14301



R. Tyler Kendrick, Esquire
Perkins Coie, LLP
1301 Second Avenue Suite 4200
Seattle, WA 98101

Re: Deposition of **Aris Silzars**
    Date: 6/10/2025
    Case: Phenix Longhorn LLS -v- AU Optronics Corp., et al.

Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of receipt of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.

Sincerely,

Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850

No. 586699

No. 586699

Re: Deposition of **Aris Silzars**
Date: 6/10/2025
Case: Phenix Longhorn LLS -v- AU Optronics Corp., et al.
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 10 | 21 | "Yeah" should be "Yes" - misspoken word |
| 12 | 8 | "patent" should be patents - transcription error |
| 13 | 13 | "renewal" should be "referenced" - transcription error |
| 16 | 24 | "5305" should be "505" - transcription error |
| 17 | 17 | "No" should be omitted - transcription error |
| 18 | 21 | "laws" should be "law" - transcription error |
| 19 | 3 | "that's" should be "that have" - transcription error |
| 23 | 22 | "since there" should be "since then" - transcription error |
| 24 | 25 | "of" should be "and" - transcription error |
| 25 | 5 | "on a" should be "on" - transcription error |
| 26 | 18 | "We're" should be "They were" - transcription error |
| 29 | 1 | "Lance" should be "Lanxide" - transcription error |
| 30 | 11 | "that" should be "at" - transcription error |
| 30 | 24 | "engineers" should be "engineers and" - transcription error |
| 32 | 16 | "as a" should be "as" - transcription error |
| 32 | 19 | "analysis" should be "analysis and" - transcription error |
| 35 | 9 | "on" should be "on it" - transcription error |
| 36 | 3 | "doing" should be "going" - transcription error |
| 37 | 22 | "analog's" should be "Innolux" - transcription error |
| 41 | 12 | "they --" should be "they are" - transcription error |
| 54 | 24 | "Analysis" should be "My analysis" - transcription error |

7/8/2025
(Date)

_____
(Signature)

No. 586699

Re:  Deposition of **Aris Silzars**
     Date: 6/10/2025
     Case: Phenix Longhorn LLS -v- AU Optronics Corp., et al.
     Return to: transcripts@planetdepos.com

| 60 | 8 | "that that" should be "that it" - transcription error |
| 70 | 6 | "it's" should be "is" - transcription error |
| 76 | 11 | "we've" should be "were" - transcription error |
| 76 | 18 | "to" should be "to use" - transcription error |
| 80 | 4 | "ten 24" should be "1024" - transcription error |
| 80 | 7 | "ten 24" should be "1024" - transcription error |
| 80 | 9 | "ten 24" should be "1024" - transcription error |
| 80 | 20 | "digital" should be "digital to" - transcription error |
| 83 | 15 | "influx" should be "inputs" - transcription error |
| 83 | 25 | "it" should be "I" - transcription error |

7/8/2025
(Date)

(Signature)

No. 586699

Re:  Deposition of **Aris Silzars**
Date: 6/10/2025
Case: Phenix Longhorn LLS -v- AU Optronics Corp., et al.
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Aris Silzars, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

7/8/2025
(Date)                    (Signature)