EXHIBIT I



# Transcript of Paul S. Min, Ph.D.

**Date:** June 12, 2025
**Case:** Phenix Longhorn, LLC -v- Innolux Corporation

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
www.planetdepos.com
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Paul S. Min, Ph.D.  
Conducted on June 12, 2025

1 (1 to 4)

---

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF TEXAS
 3                     MARSHALL DIVISION
 4    -------------------------x
 5    PHENX LONGHORN LLC,      :
 6              Plaintiff,     :
 7       v.                    : Civil Action No.:
 8    INNOLUX CORPORATION and  : 2:23-CV-00478-RWS-RSP
 9    DOES 1-10,               :
10              Defendants.    :
11    -------------------------x
12
13
14
15           Deposition of PAUL S. MIN, PH.D.
16                  Conducted Virtually
17                Thursday, June 12, 2025
18                     11:07 a.m. EDT
19
20
21
22    Job No.: 586682
23    Pages: 1 - 77
24    Stenographically reported by: Judith E. Bellinger,
25    RPR, CRR, CSR-TX, CCR-WA, CCR-NM
```

**Page 2**

```
 1         Deposition of PAUL S. MIN, PH.D., conducted
 2    virtually,
 3
 4
 5
 6
 7
 8         Pursuant to notice, before Judith E.
 9    Bellinger, Registered Professional Reporter,
10    Certified Realtime Reporter, and E-Notary Public
11    in and for the State of Maryland.
```

**Page 3**

```
 1                    A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFF:
 4         RODNEY MILLER, ESQUIRE
 5         WOMBLE BOND DICKINSON (US) LLP
 6         1331 Spring Street NW
 7         Suite 1400
 8         Atlanta, GA 30309
 9         404.879.2435
10
11         JOHN H. WRIGHT, III, ESQUIRE
12         WOMBLE BOND DICKINSON (US) LLP
13         555 Fayetteville Street
14         Suite 1100
15         Raleigh, NC 27601
16         919.755.2100
17
18
19    ON BEHALF OF THE DEFENDANTS:
20         JEFFREY JOHNSON, ESQUIRE
21         BAKER BOTTS
22         One Shell Plaza
23         910 Louisiana Street
24         Houston, TX 77002
25         713.229.1234
```

**Page 4**

```
 1           A P P E A R A N C E S   C O N T I N U E D
 2
 3    ALSO PRESENT:
 4         Ken Lauguico, Planet Depos Technician
 5         Jonathan Shelnutt, Summer Associate, Womble
 6          Bond Dickinson
 7         James Dority, Summer Associate, Womble Bond
 8          Dickinson
 9         Victor Atta-Dakwa, Summer Associate, Womble
10          Bond Dickinson
11         Parker Hancock, Summer Associate, Womble
12          Bond Dickinson
13         James Donovan, Summer Associate, Baker Bott
14         Noah Harrison, Summer Associate, Baker Bott
```

### Page 5

C O N T E N T S

EXAMINATION OF PAUL S. MIN, PH.D.                PAGE
  By Mr. Miller                                    6

E X H I B I T S
    (Attached to the transcript)
Min Exhibits:                                    PAGE
Exhibit 1   Declaration of Paul S. Min, Ph.D.,    8
            Regarding Claim Construction for US
            Patent Numbers 7,233,305 and
            7,557,788
Exhibit 2   United States Patent Number          12
            7,233,305 B1
Exhibit 3   United States Patent Number          13
            7,557,788 B1
Exhibit 4   Joint Motion for Correction of       31
            Exhibit B to the Parties' Joint
            Claim Construction and Prehearing
            Statement

### Page 6

P R O C E E D I N G S

            PAUL S. MIN, PH.D.,
        being first duly sworn, was examined
and testified as follows:
    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
            MR. MILLER:  Typically, at least start the depositions out with at least introducing the counsel, counsel of record.
            I'm Rodney Miller, Womble Bond Dickinson, on behalf of plaintiff, Phenix Longhorn, LLC.
            MR. JOHNSON:  Jeffrey Johnson, from Baker Botts, on behalf of the defendant.
            MR. WRIGHT:  This is John Wright, on behalf of plaintiffs as well.
            MR. JOHNSON:  This is Jeffrey again.  I have with me today James Donovan, Noah Harrison, who are summer associates with us at Baker Botts.  They're just listening in to grade Rodney Miller on his performance.
            MR. MILLER:  Thank you.  Again, I give, like, C-minus work, I just barely make it all the time.
            But I'll say this: Ms. Bellinger, I do

### Page 7

not have the -- I have the realtime link, and I see nothing going on here.
    Are we typing?
    Off the record.
    (Off the record.)
    MR. MILLER:  Back on the record.  We're ready to start.
BY MR. MILLER:
    Q  Dr. Min, can you, please, state your full name for the record.
    A  My name is Paul Min, M-I-N.
    Q  And have you been deposed before?  Have you been deposed before?
    A  Yes, I have.
    Q  How many times?
    A  I don't have exact numbers, but it is over 50 times.
    Q  Okay.  I just want to go, just a few ground rules, just for my purposes.
        I'm going to ask you some questions.  Please let me finish before you answer.  I will try to let you answer before I ask my next question.  And this is especially important since this deposition is fully remote.  And please answer the questions verbally.  I just wanted to

### Page 8

start by asking, is there a reason today that you cannot testify truthfully?
    A  Not that I can think of, no.
    Q  Okay.  And you're aware that the main reason for your deposition, or the reason for your deposition today is because you provided a declaration in the Phenix Longhorn v. Innolux Corporation litigation pending in the Eastern District of Texas, correct?
    A  That is correct.
        MR. MILLER:  I'll start out and admit an exhibit.  Do Exhibit 1, the Declaration of Paul S. Min, Ph.D., Regarding Claim Construction for US Patent Numbers 7,233,305 and 7,557,788.
        Can you please pull that up for me.
        (Min Exhibit 1 marked for identification and attached to the transcript.)
    A  Mr. Miller, as Mr. Johnson earlier mentioned, I have freshly printed, unmarked paper copies with me, for my declaration and two patents, that I will be discussing today.
    Q  Okay.  I'm just going to confirm that you don't have any notes written on those, do you?
    A  I do not have any notes.
    Q  I'm going to trust Mr. Johnson and

**Page 33**

1  going to speak for everybody.
2      MR. JOHNSON: We'll keep going.
3      MR. MILLER: All right. Let's do it.
4  BY MR. MILLER:
5      Q  Okay. We're going to -- all right,
6  Dr. Min. We're going to walk through some of your
7  opinions as it relates to some of these terms that
8  are in dispute in the '305 and the '433 [sic]
9  patents.
10     A  Did you mean '788 patent?
11     Q  '305 and '788 patent. Thanks for
12 correcting me, if I said it wrong.
13         Before I start here, Dr. Min, did you
14 get an opportunity to review the agreed claim
15 constructions by the parties?
16     A  Yes. I saw the list of all agreed
17 construction as well.
18     Q  Did you review those?
19     A  Yeah.
20     Q  All right. Do you have any -- do you
21 agree with the parties' agreed constructions?
22     A  I have not really spent time to analyze
23 my interpretation with regard to the agreed-upon
24 constructions. So sitting here, I have no opinion
25 to offer.

**Page 34**

1      Q  Are you aware, by any chance, that the
2  parties' agreed constructions with the
3  exception -- sorry, are you aware that the
4  parties' agreed constructions, as it relates to
5  the '305 patent, they come from the Court's prior
6  claim construction order in the Wistron
7  litigation.
8      A  That is my general understanding, but I
9  have no specific terms that comes to my mind.
10     Q  Let's talk a little bit about
11 nonvolatile storage cells.
12         Do you teach -- in your classes at
13 Washington University, St. Louis, do you teach any
14 classes that discuss nonvolatile storage cells?
15     A  Yes, I do.
16     Q  What are nonvolatile storage cells,
17 Mr. Min?
18     A  Nonvolatile means the data stored in
19 the cell stays on, even if you remove the power to
20 the cell. And "cell" here is a general term to
21 describe the context of memory, of course.
22 Something that stores a certain amount of
23 information, certain information.
24     Q  Can a non-volatile storage cell be
25 designed to store digital information?

**Page 35**

1      A  Certain type of non-volatile storage
2  cell would. Not all.
3      Q  But they can, correct?
4      A  Certain types can, yes.
5      Q  As we say "certain types," what do you
6  mean by certain type?
7      A  There are digital memories made from
8  nonvolatile cells, like flash memories, or EEPROM,
9  that's E-E-P-R-O-M, all in capital. They will
10 store digitized information. By that, most
11 typically, 1s and 0s. But sometimes you could
12 have multi-bit symbols that you can store. But
13 information stored, digital representation of the
14 actual value, or value to be approximated, at
15 least.
16     Q  Dr. Min, I just want to confirm here.
17 When you reviewed the specifications of the '305
18 patent, specifically as it related to nonvolatile
19 storage cells -- let's look at your discussion in
20 paragraph 30.
21         I want to confirm here. Are you
22 referencing the embodiment in the specifications
23 here, when you say this specification explicitly
24 identifies the memory elements as programmable
25 analog floating gate memory cells 330 through 337

**Page 36**

1  and analog storage cell?
2      A  It's paragraph 32 or 37?
3      Q  I'm looking at paragraph 30.
4  Paragraph 30.
5      A  Yeah, so in paragraph 30, I'm referring
6  to what is described in the specification.
7      Q  And when you say "what is described in
8  the specification," are you referring to an
9  exemplary environment that's in the specification?
10     A  That would be correct. In this
11 paragraph 30, that's what I'm talking about, yes.
12     Q  Also in paragraph 31, that's an
13 embodiment, correct?
14     A  Once again, I'm describing here, in
15 paragraph 31, what is stated or described in the
16 embodiment as a practicable specification.
17     Q  We're going to jump to paragraph 34.
18 This would be page 14 and page 15.
19     A  Yes.
20     Q  I'm just trying to get a general
21 understanding of your positions in paragraph 34.
22     A  Yes, I have this for you, paragraph 34.
23     Q  Can you explain paragraph 34 to us?
24     A  So, if the nonvolatile storage cell
25 was -- I'm still describing the embodiment that's

**37**

1  shown, for example, in Figure 3 of the '305
2  patent.
3       So, nonvolatile storage cell in
4  question, the numeral 330, 331, to 337, and here,
5  if this nonvolatile storage cell, 330 through 337,
6  were digital memories, like a flash memory or
7  EEPROM, then the values there would be some -- as
8  some binary numbers, 10110. If that comes out, I
9  cannot only drive or go through the drive of 340
10 and then through driver 347, respectively, and
11 then drive is a channel 0 through channel 7,
12 connected to the panel.
13      You cannot drive the display panel with
14 1s and 0s. You need to have a voltage. And to do
15 that, if these memories -- the storage is a
16 nonvolatile storage cell, 330 through 337 were
17 outputting 1s and 0s, you could not fully drive
18 that panel through this reference correction.
19 You'll need conversion of this digital values to
20 analog voltage value to do that. And here, what
21 I'm saying is, there is no description, and here,
22 this channel 0 through channel 7 on Figure 3, just
23 to take it back to Figure 2, in Figure 2, the
24 channel zero through channel 7 are shown two
25 places, gamma reference controller 210, and gamma

**38**

1  reference controller 220. And channel 0 through
2  channel 7, in both cases, gets connected to a
3  source driver that is attached to the TFT panel
4  280, without having any gateway converter, and
5  this would not work. Therefore, the values stored
6  in nonvolatile storage cells were digital values.
7    Q   All right. I got that.
8        And then you go on and say, so this
9  configuration, I'm assuming that you're talking
10 about, from what you're speaking here, figures in,
11 saying in the exhibits, the patent exhibits, you
12 say "This configuration would contradict the
13 explicit language of claim 1, which requires
14 'drivers connected to said storage cells'."
15   A   I'm sorry, which paragraph are you
16 reading, please?
17   Q   I'm on the last sentence of paragraph
18 34.
19   A   34. Okay.
20   Q   Yes, sir.
21   A   Yes. That's correct.
22   Q   And can you explain what you mean by
23 that, by that last sentence in paragraph 34?
24   A   That's what I just said. If
25 nonvolatile storage cell 340 -- or 330 through 337

**39**

1  were digital memory cells, such as flash memory or
2  EEPROM then they would go to driver and then
3  become this channel output, CH0 through CH1, and
4  connected to the panel. And that the claim
5  language says the drivers connected to said
6  storage cell, that would not work. And drivers do
7  not take 1s and 0s, you take a value, and then the
8  value, that value is the actual voltage value, and
9  that goes into the driver and gets connected to
10 the panel. So that would not make sense.
11   Q   All right. So are you reading the
12 claim language, and we'll talk about this later,
13 but, I mean, we can talk about it now. Is your
14 interpretation of this based on the fact that when
15 it says "drivers connected to said storage cells,"
16 there has to be some direct connection?
17   A   Yes. That is correct.
18   Q   So we can't -- it can't connect to
19 something through something else?
20   A   Not -- no, not in the context of the
21 '305 patent and '788 patent, no.
22   Q   We're doing two things at once. We're
23 talking about the storage. We are talking about
24 drivers connected to said storage cells.
25      So let's pull up -- I just want to know

**40**

1  if you consider --
2        We'll pause that. I'm going to go back
3  to that "drivers connected to said storage cells."
4  I'm jumping around here. Trying to keep the
5  record a little cleaner.
6        It's nice. All right. So let's pull
7  up, so you had your position on drivers connected
8  to said storage cells. So, it's your position it
9  had to be connected, it can't be through
10 something.
11       Have you considered, in the '305
12 patent, claim 8, just the language of claim 8,
13 where it says an output pin connected to an output
14 pin through a second multiplexer?
15   A   If this is a claim 8 --
16   Q   Yeah, last --
17   A   Claim 8. I read that.
18       So in this case, it is explicitly
19 stated that the connection has something in
20 between. So it makes it clear. But when it comes
21 to describing this particular -- the configuration
22 as stated in the paragraph 34, the last sentence,
23 that -- there, here, it's actually -- and the
24 specification directly says that. The
25 specification says this.

**41**

1  I'm going to refer to '305 patent.
2  Part of the paragraph that starts at line 46,
3  column 1, regarding Figure 1. And here, the last
4  part of the paragraph, starting from line 57, you
5  know, we're talking about all this -- the
6  connection made it to the -- this is GM numbers,
7  and the last sentence says "Since the loading of
8  the source drivers 110, 111, 112, changes
9  dynamically, it is not possible to simply connect
10 the resistive divider," all the resistors listed,
11 "to the inputs of the source drivers," and then it
12 says some type of buffering on -- used, "such as
13 the gamma reference for ICs 170 and 171."
14     It's just a cell. Simply connect means
15 just connected. This is with regard to Figure 1,
16 the prior art embodiment. Just making the
17 connection there is not going to work; you have to
18 have some kind of intermediate. This make it
19 really clear, when the patent describes something
20 is connected to something else, that means making
21 the connection directly, not anything between.
22     In contrast to claim 8, you just
23 described, explicitly explained that the
24 connection has something in between. So that
25 makes it clear.

**42**

1  Q   So claim 8 says an output pin connected
2  to an output through something else.
3      And you're stating that that language
4  contradicts your position where you're saying that
5  connected to has to be directly --
6  A   No.
7  Q   -- to connect?
8  A   No.
9  Q   You don't think?
10 A   No, it does not. What this last
11 limitation of claim 8 is saying is, and it says
12 output pin is connected to a second multiplexer
13 which is, in turn, connected to an output. That's
14 what the -- what this sentence you just read from,
15 claim 8, you're referring to. When it says "an
16 output pin connected to an output through a second
17 multiplexer," that means output pin connected to a
18 second multiplexer, which is connected to an
19 output.
20     So that's exactly what I said. When
21 there's a -- the sequence of connection, that's
22 exactly what the claim language is describing.
23 Q   So in your analysis of the drivers
24 connected to storage cells, did you consider the
25 language in claim 8?

**43**

1  A   I mean, I read claim 8 also.
2  Q   I'm asking you, did you consider -- did
3  you consider the use of "connected to" in your
4  analysis of connected to --
5      MR. JOHNSON: Objection.
6  Q   -- in claim 1?
7      MR. JOHNSON: Objection. Form.
8  A   Yes, I have considered the patent as a
9  whole, including all claims.
10 Q   And we are -- the claim language is "is
11 connected to" and "is coupled to." But throughout
12 the patent, there are numerous source descriptions
13 says something is, something connects to
14 something. So, as opposed to something -- A is
15 connected to B, there are numerous places that
16 says B connects to A, in direct form. And
17 everywhere it is stated that way; the description
18 is consistent. When something connects to
19 something else, or something is connected to
20 something else, in both cases, the connection is
21 direct connection.
22     Despite the fact that claim 8 says A
23 connected to B through C?
24 A   Well, as I just mentioned, A is
25 connected to B through C, as an in-between through

**44**

1  C. So that means A is connected to C, which is
2  connected to B. That's what that statement is
3  saying.
4  Q   All right, Dr. Min. We'll be going
5  back and forth on that one.
6      All right. Let's go back to your
7  statement in the nonvolatile memory, in
8  paragraph 35 on page 15.
9      I'm trying to understand your position
10 here. You say the integrated circuit of claim 1
11 wherein said nonvolatile storage cells hold analog
12 voltage values, you're referring to claim 4?
13 A   Yes.
14 Q   All right. So isn't -- claim 4 is a
15 dependent claim of claim 1, correct?
16     MR. JOHNSON: Objection.
17 A   Yes. That's correct.
18 Q   And claim 4 explicitly states that the
19 nonvolatile storage cells hold analog voltage
20 values.
21     I'm trying to understand how you are
22 looking at this to form your next statement here,
23 that you say that this explicit statement, that
24 the cells hold analog voltage (indiscernible)
25 dictates the interpretation arrived in claim 1?

---

53

1  construction is to say one or more circuit that is
2  selectively coupled, and you say selectively
3  coupled a multiplexer or selectively coupled a
4  demultiplexer?
5     A   So the coupler is either doing the --
6  number 1 or number 2, right?  So that's what
7  the -- that's what the -- the proposed
8  construction in the Phenix's proposed construction
9  says.  You can couple, according to number 1, as
10 shown in this construction, or according to number
11 2.
12       But you also added -- the Phenix also
13 added selectively, in other words, a multiplexer
14 device can do one of these two, depending on what
15 you select the device to do.  That does not
16 happen.  There's no multiplexer that does that.
17 And --
18    Q   I thank you very much, Dr. Min.  We'll
19 probably have a conversation with your counsel
20 about that.  Because I don't think we -- I just
21 want to get from you is, do you agree that a
22 multiplexer -- again, does a multiplexer have some
23 type of selecting functionality?
24       MR. JOHNSON:  Objection to form.
25    A   Selecting function with regard to what

54

1  mode it is doing the multiplexing or
2  demultiplexing, that selection does not exist.
3     Q   So it is your opinion that the
4  multiplexer, this is the multiplexer when it goes
5  many to one, it has no type of selecting
6  functionality in it to decide which many to one in
7  the multiplexer?
8     A   No, that's not what I am saying.
9  Because it is a selectively coupled.  It's
10 selectively on the couple.  And the coupling is
11 either one or two, right?  You list option 1 or
12 option 2.  That's what the construction says.
13       You either -- you couple it according
14 to 1 or you couple according to 2.  And then --
15    Q   No, I'm not -- Dr. Min, I'm not asking
16 about the construction.  I'm asking about,
17 generally, multiplexers and the functionality of
18 multiplexers.  I'm asking you to get an
19 understanding of, you have many to one, are we
20 talking about multiplexer or are we talking about
21 demultiplexer, one to many?  Within that
22 multiplexer, is there some type of functionality
23 that allows it to select from that many to one?
24       So, you have -- say you've got four
25 going in and it's coming out with one of the four.

55

1  Does the multiplexer, does it have some type of
2  functionality that allows a selection of those?
3     A   Yeah, yeah.  So within the confine of
4  one particular multiplexing function, you can
5  dynamically get a generator pattern of the
6  multiplexing.  So I wouldn't call it a selectivity
7  coupling.  I would say dynamic control, or
8  sometimes called dynamic multiplexer.  You do that
9  in real time.  So you can do that.
10    Q   All right.  Thank you very much.
11       All right.  Dr. Min, we can jump to the
12 '788 patent.  We're jumping to page 33.
13       Talk about your opinion on gamma
14 reference control capabilities.
15    A   Yes.
16    Q   In your opinion, what is the '305
17 patent directed to?
18    A   '305 patent is generally directed to, I
19 think, the gamma correction on a TFT panel, but in
20 some very particular way.  And it criticizes as a
21 background prior art existing.  And this is part
22 of the background.  And then it also criticizes
23 some of the -- contemporaneously, at the time of
24 the '305 patent, some digital-based approach.
25       Which involves a number of additional

56

1  components.  So it -- at the end -- this is column
2  2, starting from about line 7, so the previous
3  conventions.  And this is what the sentence is
4  saying:  Both inventions teach quite complex
5  digital approaches to this analog problem, so
6  "analog problem" being the gamma correction, the
7  voltage applied as analog value.
8        So -- and then the -- both of the
9  previous prior art was extensive.  So what line 10
10 of column 2 is designed to gamma reference
11 architecture that automates gamma adjustment and
12 provides programmable capability and achieves
13 acceptable cost.  And this acceptable cost comes
14 from not utilizing this digital approach to the
15 analog problem, which is the gamma correction.
16    Q   And what about the '788 patent?
17    A   I mean, it's a very similar, but not
18 identical -- identical -- I didn't do, like, a
19 line-by-line comparison, but the specification is
20 very similar.  Here, the independent claim recites
21 to calibration of liquid crystal drive, and then
22 using the gamma correction.  And, once again,
23 utilizing this analog, the storage cell, and then
24 you have the optical sensors that's, basically,
25 feeding back the correction.

**57**

1  So, that's what '788 patent is.
2  Q  All right.  We're looking at the '788.
3  We're in the '788 patent here.  I'm going to go
4  through a few things here.  We've got -- go to
5  page -- you can pull it up, if you want to.
6  Exhibit 3, make it simple, Exhibit 3.  We're going
7  to look at row 2, looking at the summary of the
8  invention.  And it says the invention is a
9  programmable buffer integrated circuit, which can
10 be programmed to output a set of gamma correction
11 reference voltages to be used in LCDs.  Once
12 programmed, the buffer will continuously output
13 the program value, the power is removed, and it's
14 a voltage value that is stored in nonvolatile
15 programmable memory, gamma correction is retained.
16 The device incorporates program interface to allow
17 the programming of the buffer outputs to the
18 desired values during manufacturing and testing of
19 the panel.  Multiple sets of gamma values can be
20 programmed and stored to provide optimized gamma
21 correction curves for different users or
22 application requirements.
23      Did I read that correctly?
24  A  I think so.  Yes.
25  Q  And earlier, you stated, when you gave

**58**

1  a general summary of the '305 and the '788, you
2  said that the '305, at least, had a gamma
3  reference on the TFT panel, correct?
4      That's what you stated, right?
5  A  Yes.
6  Q  All right.
7  A  Because the field of invention is the
8  TFT and the liquid contrast -- yeah, okay.  And
9  that is more particularly to TFT.  But the
10 restriction to TFT is not necessarily.  The LCD
11 panel works in a similar way.
12  Q  All right.  So, what we're looking at
13 is we kind of agree it is at least some type of
14 programmable buffer, integrated circuit that can
15 be used in an LCD panel, generally?
16  A  Yes, that's correct.
17  Q  And it can be programmed to output a
18 set of gamma correction reference voltages to be
19 used in those panels, right?
20  A  Yes.  That's correct.
21  Q  Okay.  So I just want to go back.  We
22 have some embodiments in here, too.  You talked
23 about some of the embodiments.  You talked
24 about -- you know, talked about Figure 2.  In
25 Figure 2, it was an architectural design.  And you

**59**

1  have Figure 3.
2      You reviewed Figure 3, Dr. Min?
3  A  Yes.
4  Q  And that is, what, a gamma reference
5  controller 300, correct?
6  A  Yes.  That's correct.
7  Q  All right.  And then gamma reference
8  controller, it comprises a programming engine or
9  interface and a multiplexer, programmable analog
10 floating gate memory cells through drivers,
11 correct?
12  A  That's correct.
13  Q  All right.  And then, we also have in
14 here, we've got a Figure 6 as well?
15  A  Yeah.
16  Q  All right.  So I -- so let's look at,
17 going to '788, let's look at claim, we're going to
18 go to column 7.  And we're going to look at some
19 of the claim language here.  Look at claim
20 limitation 1A.  And we're going to look at claim
21 limitation 1E.
22  A  Okay.
23  Q  All right.  Claims limitation 1a says
24 "Providing said display with gamma reference
25 control capability, which is electronically

**60**

1  reprogrammable and nonvolatile."
2      And we have claim 1e.  "Storing said
3  gamma reference voltage level and said gamma
4  reference control capability."
5      Looking at this, this general
6  discussion about specification, trying to get from
7  you -- understand from you.  Is that -- is it
8  possible that that providing said display with
9  something, can that providing said display, can
10 that gamma reference control capability, could
11 that be the integrated circuit that's discussed in
12 the specification?
13     MR. JOHNSON:  Objection to form.
14  Q  Specifically, the circuit of Figure 2
15 and the circuit of Figure 6?  I'm sorry, Figure 3.
16 My apologies, Figure 3 and Figure 6.  I mean, you
17 agree the summary of inventions, as you stated, is
18 a programmable buffer-integrated circuit, which
19 can be programmed to output a set of gamma
20 correction references to be used in a liquid
21 crystal display, which is a panel.
22  A  Yes.  That, I agree.  But let me now
23 just read the question described here in my
24 report -- declarations.
25      If you look at -- I describe this in my

### 65

1  the wording itself, gamma reference control
2  capability, it has something to do with the
3  control in there, right? Storing some values,
4  that is not the entirety of the control. So to
5  me, reading this terminology, it has to do
6  something more than this, but what is required is
7  here. So I don't know where the boundary is.
8       Am I okay if I'm just to have, like, a
9  nonvolatile storage, like a, you know, analog
10 cells or even the flash memory stored at value?
11 Is that good enough?
12    Q   It could be, right, Dr. Min?
13    A   But then, it says the term, itself, it
14 says, okay, so, here, "Method of calibrating
15 liquid crystal display to desired gamma curve to
16 compensate for the panel to panel manufacturing
17 variations comprising the steps."
18      So in the context of the claim
19 language, claim 1 as a whole, the gamma reference
20 control capability, to a POSA, should do something
21 more than this, just than storing the value. That
22 doesn't have the control aspect of it.
23      So I don't know the boundary of this
24 claim term. And it does not really say anything
25 about the structure in the claim 1.

### 66

1       So, if it is a means-plus-function,
2  then I go and take a look at it and see if there's
3  a structure that does this. And that's really
4  what I am talking about here.
5     Q   Dr. Min, by any chance, did you take a
6  look at Innolux's IPR regarding the '788 patent,
7  see their positions?
8     A   I did not. And, you know, that, my
9  opinion that I just described to you, is described
10 in paragraph 94. It has a -- some kind of
11 capability. Not just storing something, but it
12 has a control capability. And, to me, it's not
13 just to having the value. You have to do
14 something more.
15      And so, it goes on to say -- there's no
16 particular structure that just does that. So I
17 have to look at something more to actually provide
18 the capability portion. And if this is not
19 means-plus-function, which I'm informed to be
20 subject to 112F, and I could not find the
21 structure that actually is just recited, then I'll
22 just do, generally, the gamma reference control
23 capability. What does that mean? There are
24 certain disclosures that describe the structure
25 that describes this. Then what I found is that.

### 67

1  Like, gamma reference controller, including the
2  program interface.
3       And the program interface part comes
4  from the fact that inconsistency between the
5  Figures 2 and 3 and 6. So where does the
6  programming interface belong to? They are
7  different. And so, using the programming, the
8  Figure 2, the proposed construction is what I have
9  described earlier on, that's shown in my report,
10 under the heading of gamma reference control
11 capability.
12    Q   All right. So, Dr. Min, is your
13 problem with this term is the fact that it's just
14 called gamma reference control capability? You're
15 just not comfortable with the name?
16      MR. JOHNSON: Objection. Form.
17    A   The name -- the name is describing
18 something. It has a -- it's some kind of
19 capability that is related to gamma -- gamma,
20 what's the rest, gamma voltage controls. Gamma
21 reference controls. Just one second, please.
22 Gamma reference control capability. Yeah, gamma
23 reference control capability.
24      So it's not just to any capability, but
25 it's a capability that's described by the word,

### 68

1  the claim term gamma reference control.
2     Q   I see.
3     A   So this is gamma reference control.
4     Q   All right. I'm speaking -- you're a
5  person of skill in the art, so I'm going to speak
6  hypothetically here. So if we were to call
7  this -- if the claim language said providing said
8  display with gamma reference controller which is
9  electronically reprogrammable and nonvolatile,
10 would that be acceptable to you?
11      MR. JOHNSON: Objection. Form.
12    A   Gamma reference controller? I mean,
13 that would be better, but I would still like to
14 see more description. Something that gives me, I
15 know the structure that is related to the
16 capability, as a part of a claim language, that
17 tells me the boundary of the claim. Controller,
18 integrated circuit chip, yeah, then it'll be
19 better. But controller, even could mean something
20 more than just to chips. Controller could be
21 something else. It could even be a software.
22      So -- and I have to be able to know the
23 scope of the claim with a reasonable clarity and
24 this capability does not really give me that
25 clarity.

**Page 69**

1  Q  I'm just trying to understand this. So
2  is your issue with the word "capability" that's in
3  the claim?
4  A  I mean, the term as a whole, gamma
5  reference control capability. But capability is
6  certainly what triggers it more than anything
7  else.
8     MR. JOHNSON: ERod, is this a good
9  stopping place, if you're going to switch gears?
10    MR. MILLER: Yeah, we can take a break.
11 How long do you need, 15 minutes, ten minutes.
12    MR. JOHNSON: Just ten minutes is fine.
13    MR. MILLER: Okay. Off the record.
14    (Recess taken from 1:01 p.m. to
15 1:19 p.m.)
16    MR. MILLER: Back on the record.
17 BY MR. MILLER:
18  Q  Dr. Min, welcome back.
19  A  Thank you.
20  Q  We're going to talk about the term
21 "control circuit."
22    All right. On page -- just jump around
23 here. I'll just ask you, Dr. Min, you say that
24 the term "control circuit" is a term that's
25 generally understood in electrical engineering.

**Page 70**

1  What do you mean by that?
2  A  You're referring to paragraph 102?
3  Could you --
4  Q  If you want to know the specific
5  paragraph --
6  A  Yeah.
7  Q  -- we can talk about paragraph 107.
8  A  107.
9  Q  Or I can scratch that question, just
10 ask another question.
11    What is a control circuit? You, as a
12 professor, what is a control circuit?
13  A  It's a circuitry that controls
14 something, whatever that underlying objective of
15 the control is.
16  Q  Is -- would you say that a control
17 circuit is a structure?
18  A  It is a structure because it's a
19 circuit. So, when I hear the term "control
20 circuit," it has some boundary that
21 (indiscernible). It cannot be, like, a
22 (indiscernible) period, it's a circuit.
23  Q  And we can go to paragraph 107.
24  A  Okay.
25  Q  I'll just let you review paragraph 107.

**Page 71**

1  A  Okay.
2  Q  I just want you to elaborate on
3  paragraph 107. I'll give you a chance to look at
4  it, and then I will read through it.
5  A  Yeah.
6  Q  All right.
7  A  I just read it.
8  Q  Okay. So when you say that the term
9  "control circuit" is a generally understood term
10 in electrical engineering, what do you mean by
11 that statement?
12  A  It's some circuitry, as I mentioned to
13 you, that does control of some -- according to
14 some objective. But what I am saying in this
15 paragraph is as a part of -- recited as part of
16 claim 1 of the '788 patent, it describes various
17 requirement that the circuitry has to do, but it
18 doesn't -- you know, I've listed all the
19 possible -- possibilities that could be the
20 control circuit. So it doesn't give me the clear
21 idea as to what is the scope of this claim 1.
22 That's what I'm trying to say here.
23  Q  Based upon your reading of the claim 1
24 of your '788 patent and your reading as it
25 pertains to control circuit, would you identify

**Page 72**

1  here these four things, these are the four things
2  that you -- that it could possibly refer to?
3  A  Yeah.
4  Q  Okay. Which was number 1. The on-chip
5  program interface of the gamma reference voltage
6  generator, ICs, or integrated circuits?
7  A  Yes.
8  Q  Number 2, gamma reference generator
9  integrated circuit, themselves, which, for
10 example, the AG 1A1A, are to be an external
11 device, like PC-connected for testing or
12 calibration, which might also embody the means for
13 executing a predetermined algorithm. You've got
14 4, some combination of these and specific subparts
15 thereof.
16    Right?
17  A  Yes.
18  Q  That's your understanding?
19  A  I listed -- as I was reading the term,
20 and this came to my mind, saying that any of this,
21 number 4 is sort of like, any combination or some
22 subpart. So it's just very unclear.
23  Q  And these four points that you have
24 here on page 4, paragraph 107, was this based on
25 your understanding of the specification?

---

73

1  A   Well, yeah, part, because here, in '788
2  patent, it talks about the method of calibrating a
3  liquid crystal display. So, you know, we're
4  talking about some form of making an adjustment of
5  this LCD to, you know, fit the, you know, the
6  gamma to the -- the gamma curve. So, yes, it's
7  also coming from the specification because, you
8  know, AG 1A1A is used as an example in, like,
9  figures.
10      So 4 and 5 relate -- I'm sorry, 4A and
11 4B, and it's describing the chip, AG 1A1A.
12      So all this, based on the reading of
13 the patent, and trying to figure out what the
14 scope of the claim 1 is, and I come up with all
15 this possible different scenarios.
16  Q   All right. Thank you.
17      And, Dr. Min, again, I'm going to ask.
18 So the means for executing a predetermined
19 algorithm, by any chance, did you consider
20 Innolux's position taken in its IPR petition in
21 drafting this section?
22  A   Not personally, no.
23  Q   And I'm going to ask this, so maybe I'm
24 going to go into gamma reference voltage level on
25 page 51.

74

1  A   Yes.
2  Q   Can gamma reference voltage levels, can
3  they be stored as digital data?
4  A   No. I think if you read the claim, so
5  as a part of claim 1 -- so this gamma reference
6  voltage level is coming from stored in the gamma
7  reference control capability, which, according to
8  1a, is electrically reprogrammable and
9  nonvolatile. But this term, it's recited here in
10 claim element 1c of the '788 patent, varying gamma
11 reference voltage level on columns of a set
12 displayable -- set displayed by a control circuit,
13 where set control circuit is separate from the
14 display.
15      And so, you're actually varying the
16 voltage level right at the -- on the columns of a
17 display panel. So, you know, that voltage level
18 has to have an analog voltage in order to vary
19 right there, and that cannot come from a digital
20 nonvolatile storage cell.
21  Q   Are you familiar with the term "gamma
22 reference voltage levels," outside of the context
23 of the '788 patent?
24  A   I know what gamma correction is, and
25 the voltage associated with that, the gamma

75

1  correction. So this is a particular term that, I
2  think, '788 patent is using. But I think one -- I
3  know what gamma correction is.
4  Q   How about voltage levels? You have
5  heard the term voltage levels?
6  A   Sure.
7  Q   And voltage levels -- can voltage
8  levels be stored as -- can that be stored as
9  digital data?
10 A   In the general context, yes.
11     But not as recited in this claim 1,
12 because you are talking about this gamma reference
13 voltage, none of it is actually on the column,
14 it's actually there. And that's where the gamma
15 reference voltage levels are first recited.
16     And then here, in 1e, it says storing
17 said gamma reference voltage level. So it's the
18 same one, not digital version of that, what is
19 applied to that column. The same gamma reference
20 voltage level is stored in this gamma reference
21 control capability.
22     So whatever is applied on the columns
23 of a display panel is also stored, the same one,
24 and it has to be the analog value because you
25 cannot really apply that voltage level, not the

76

1  digital representation of the voltage level, but
2  actual voltage is applied to that column.
3  Q   And voltage levels have digital
4  representation?
5      MR. JOHNSON: Object to form.
6  A   I mean, if you have a digital
7  representation before you apply to the column, you
8  have to be converted to analog value. I mean,
9  that's what drives the column of the display
10 panel.
11     MR. MILLER: Thank you, Dr. Min.
12     Counsel, I pass the witness.
13     MR. JOHNSON: I have no questions at
14 this time.
15     MR. MILLER: Okay.
16     THE WITNESS: Thank you.
17     MR. MILLER: Thank you very much again,
18 Dr. Min, for your time.
19     THE WITNESS: Thank you. Good to meet
20 you.
21     (Off the record at 1:31 p.m.)
22
23
24
25

```
                                                    77
 1   CERTIFICATE OF REPORTER - NOTARY PUBLIC
 2        I, JUDITH E. BELLINGER, RPR, CRR, CSR,
 3   the officer before whom the foregoing deposition
 4   was taken, do hereby certify that the foregoing
 5   transcript is a true and correct record of the
 6   testimony given; that said testimony was taken by
 7   me and thereafter reduced to typewriting under my
 8   direction; that reading and signing was not
 9   requested; and that I am neither counsel for,
10   related to, nor employed by any of the parties to
11   this case and have no interest, financial or
12   otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set
14   my hand and affixed my notarial seal this 23rd day
15   of June, 2025.
16   My Commission Expires:  November 3, 2028
17
18
19   [signature: Judith E. Bellinger]
20   _____
21   NOTARY PUBLIC IN AND FOR
22   THE STATE OF MARYLAND
23
24
25
```