## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| PHENIX LONGHORN LLC,<br><br>        Plaintiff,<br><br>v.<br><br>AU OPTRONICS CORPORATION,<br>HISENSE ELECTRONICA MEXICO,<br>S.A. DE C.V., HISENSE USA<br>CORPORATION, HISENSE VISUAL<br>TECHNOLOGY CO., LTD., and DOES 1–10,<br><br>        Defendants. | **CIVIL CASE NO. 2:23-cv-00477-RWS-RSP**<br><br>**JURY TRIAL DEMANDED** |
| PHENIX LONGHORN LLC,<br><br>        Plaintiff,<br>      v.<br><br>INNOLUX CORPORATION and<br>DOES 1–10,<br><br> Defendants. | **CIVIL CASE NO. 2:23-cv-00478-RWS-RSP**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF PHENIX LONGHORN LLC'S
## <u>REPLY CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

I.     THE '305 PATENT ............................................................................................. 1

    A.    "non-volatile storage cells"...................................................................1

    B.    "connected to" and "coupled to"..........................................................2

    C.    "multiplexer"........................................................................................3

    D.    "bank(s)".............................................................................................4

    E.    "external source for the high voltage programming means" ..................5

II.    THE '788 PATENT ............................................................................................. 5

    A.    "Gamma reference control capability" ..................................................5

    B.    "control circuit" ...................................................................................7

    C.    "means for executing a predetermined algorithm"/ "means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor / means for executing said predetermined algorithm" ...................................................................8

    D.    "predetermined algorithm" ..................................................................9

    E.    "optimizing said gamma reference voltage levels" ..............................10

    F.    "gamma reference voltage levels" .......................................................10

# TABLE OF AUTHORITIES

**Cases**

*Apex Inc. v. Raritan Computer, Inc.*,
    325 F.3d 1364 (Fed. Cir. 2003) ........................................................................ 7

*Arigna Tech. Ltd. v. Nissan Motor Co.*,
    No. 2:22-CV-126, 2022 WL 1449701 (E.D. Tex. May 9, 2022) ...................... 3

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) ........................................................................ 8

*Freeny v. Murphy USA Inc.*,
    No. 2:13-CV-791-RSP, 2015 WL 294102 (E.D. Tex. Jan. 21, 2015) ............. 10

*In re Power Integ'ns, Inc.*,
    884 F.3d 1370 (Fed. Cir. 2018) ........................................................................ 2

*Intel Corp. v. VIA Techs., Inc.*,
    319 F.3d 1357 (Fed. Cir. 2003) ........................................................................ 2

*Kaavo Inc. v. Amazon.com Inc.*,
    No. 14-CV-353-LPS-CJB, 2018 WL 3025040 (D. Del. June 18, 2018) .......... 9

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) .......................................................................... 1

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004) ........................................................................ 7

*Mad Dogg Athletics, Inc. v. Peloton Interactive, Inc.*,
    No. 2:20-CV-00382-JRG, 2021 WL 3200994 (E.D. Tex. July 28, 2021) ........ 6

*MIT & Elecs. for Imaging, Inc. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006) ........................................................................ 7

*Nevro Corp. v. Bos. Sci. Corp.*,
    955 F.3d 35 (Fed. Cir. 2020) ............................................................................ 8

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998) .......................................................................... 6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... 3, 4

*Qualcomm Inc. v. Intel Corp.*,
    6 F.4th 1256 (Fed. Cir. 2021) .......................................................................... 9

*SAS Inst., Inc. v. World Programming Ltd.*,
    No. 2:18-CV-295-JRG, 2020 WL 569856 (E.D. Tex. Feb. 5, 2020) ................ 2

*Techtronic Indus. Co. v. Int'l Trade Comm'n*,
   944 F.3d 901 (Fed. Cir. 2019).............................................................................. 2

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015)............................................................................. 6

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)............................................................................. 9

*Zeroclick, LLC v. Apple Inc.*,
   891 F.3d 1003 (Fed. Cir. 2018)............................................................................. 6

Plaintiff Phenix Longhorn, LLC ("Phenix") submits this Reply Claim Construction Brief to Defendants' Responsive Claim Construction Brief (AUO Dkt. 141, Innolux Dkt. 104).

## I.    THE '305 PATENT

### A.    "non-volatile storage cells"

As explained in Phenix's Opening Brief (AUO Dkt. 134, Innolux Dkt. 96), Phenix requests the Court adopt its prior construction of this term. (Dkt[1]. 134 at 6-7, Dkt. 134-4 at 18-25). Defendants' proposed construction is not supported by the intrinsic evidence and is based on a misreading of the '305 Patent as purportedly "teach[ing] away" from the use of digital memory.[2] *See* Dkt. 141 at 4. But the Court's prior decision rejected this very same "teaches away" argument because "[t]he alleged disparagement is not a general disparagement of digital circuits because the prior art that is criticized includes both analog and digital approaches" and "[n]owhere in the specification is there any contrasting between analog and digital storage cells." Dkt. 134-4 at 24. The Court further determined that the "Digital to Analog Converters (DACs) all could perform this function in some ways better than the Select-On-Test resistors, but the cost is unacceptable" statement in the '305 Patent's "Description of Related Art" is not an explicit or inferred disavowal of digital storage cells because it "does not clearly indicate that replacing the resistors with programmable storage cells that store digital values is unacceptable or that the invention does not include digital storage cells." *Id.* at 25. Defendants fail to cite to any evidence in the claims, specification, or prosecution history to show otherwise.

---

[1] All Dkt. cites are to the AUO Docket.
[2] Dependent claim 4 weighs against Defendants' construction because it limits the "non-volatile storage cells" to "hold analog voltage values." '305 Patent at Claim 4. In contrast, independent claim 1 references a broader non-volatile storage cell that is not limited by the "hold analog voltage values" limitation. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.").

Further, Defendants assert that the term must be limited to an "analog" solution because the specification lacks written description or enablement support for a digital solution. Dkt. 141 at 5-6. Defendants are wrong. *See Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) (holding that the internal circuitry of an electronic device need not be disclosed in the specification if a POSA would understand how to build and modify the device). In any event, whether the claim is adequately supported is a factual issue that is not addressed during claim construction proceedings. *SAS Inst., Inc. v. World Programming Ltd.*, No. 2:18-CV-295-JRG, 2020 WL 569856, at *18-19 (E.D. Tex. Feb. 5, 2020) (rejecting enablement indefiniteness arguments at claim construction).

Defendants also rely on *Power Integrations* and *Techtronic* to support their "teaching away" argument, but both cases are distinguishable. In *Power Integrations*, the Court faulted the PTAB's use of the "broadest reasonable interpretation," which resulted in a construction not supported by the specification and claim language. *In re Power Integ'ns, Inc.*, 884 F.3d 1370, 1375-77 (Fed. Cir. 2018). And in *Techtronic*, the Court found that the patent disavowed coverage of wall consoles lacking a passive infrared detector because the entire specification described the invention as having the placement of the detector in the wall console. *Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 908-09 (Fed. Cir. 2019). By contrast, here the '305 Patent describes an integrated circuit that "can be programmed to output a set of gamma correction reference voltages" to be used in a display. Dkt. 134-2 at 2:16-19. It further teaches that the "voltage value is stored in non-volatile, programmable memory," which the Court found may store either analog or digital values. *Id*. at 2:19-22.

### B.        "connected to" and "coupled to"

As discussed in the Opening Brief, these terms should be accorded their plain and ordinary meaning because the terms are used in a straightforward manner. *See* Dkt. 134 at 8-9. Defendants

did not identify intrinsic support for their proposed construction and instead only point to *other cases* with *other facts* that they believe should be applied to limit the scope of the terms of the '305 Patent. *See* Dkt. 141 at 6-9. Defendants' omission of any intrinsic support stands in stark contrast to the term's straightforward use in the claims. Dkt. 134 at 8-9. Further, claim 8's recitation of "an output pin ***connected to*** an output ***through*** a second multiplexer" directly contradicts Defendants' construction. Dkt. 134-2 at Claim 8 (emphasis added). Defendants' reliance on *Arigna* is misplaced. *See* Dkt. 141 at 9. In *Arigna*, the Court discredited the statement—"a control voltage [that] is ***connected to*** the positive electrode . . . ***via*** a resistor"—because it was found only in the prosecution history and not in the claim language. *See Arigna Tech. Ltd. v. Nissan Motor Co.*, No. 2:22-CV-126, 2022 WL 1449701, at *4-5 (E.D. Tex. May 9, 2022) (emphasis added). By contrast, the differentiating language in the '305 Patent is found in the language of the claim itself and must therefore be afforded deference because the "[d]ifferences among claims can [] be a useful guide in understanding the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

Defendants' other assertions only serve to muddy the jury's understanding of the term. For example, Phenix does not argue that the terms should be given any construction. *See* Dkt. 141 at 9. Rather, Phenix believes the jury would be best served by the terms being given their plain and ordinary meaning due to their straightforward use in the claim language. Dkt. 134 at 8.

### C. "multiplexer"

Defendant AUO fails to provide any intrinsic support for adding a negative limitation— "excluding a I2C serial bus"—to the Court's prior construction of the term "multiplexer" and the Court should reject AUO's proposal. *See* Dkt. 141 at 10-11. AUO seeks to limit the term's scope and exclude an I2C serial bus from the term's definition without any explanation. Dkt. 141 at 10.

For this reason, AUO's construction should be rejected outright. Further, defining the term based on what it is *not*, would only serve to confuse the jury. Defendants do not dispute that the Court's "existing construction [] captures the inherent function of selection," thus conceding that Phenix' proposal to clarify the Court's prior construction[3] is proper. *Id*. As such, Phenix's proposed addition will assist the jury in understanding that the "inherent" meaning of "multiplexer."[4]

**D.        "bank(s)"**

There is no support in the intrinsic record for AUO's request to limit the non-volatile storage cells to those organized into an "n by m matrix format." AUO's assertion that "claim 1 was allowed only when the examiner added 'wherein said non-volatile storage cells are organized into two or more banks of cells,'" mischaracterizes the prosecution history. *See* Dkt. 141 at 11-12, Dkt. 141-11. Claim 1 was amended to include the allowable subject matter from original dependent claim 6. *Compare* Ex. A at 3 and 9 *with* Dkt. 141-11 at AUO_0000590. And since dependent claim 6 was originally allowed by the examiner, no narrowing statements were made during prosecution. As such, nothing in the intrinsic record supports AUO's assertion that "bank(s)" be "arranged in n by m matrix format." AUO thus only offers extrinsic evidence to support its proposed construction. However, reliance on such extrinsic evidence is not appropriate to support claim construction unless it is first shown the claim term is ambiguous, which is not the case here. *See Philips*, 415 F.3d at 1318 ("[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative

---

[3] As stated in Phenix's Opening Brief, Phenix's addition of the term "selectively" to the Court's prior construction is required in light of recent challenges to the claim scope in one of Defendants' (now denied) Petition for *inter partes* review. *See* Dkt. 134 at 10-11.
[4] Dr. Min's misapplication of "selectively" is of no moment as neither Innolux's nor Phenix's experts struggled to understand the term's purpose and the term's plain meaning.

meaning of claim language."). More importantly, AUO's contention that the term is ambiguous is directly contradicted by Innolux's position that the term does not require construction.

E.    **"external source for the high voltage programming means"**

Innolux's proposed construction does not clarify the term "external"—which is already readily understandable by a jury—but instead seeks to limit the term by restricting it to be "not inside *or a part of*" an integrated circuit. *See* Dkt. 141 at 13-14 (emphasis added). And the intrinsic record does not support Innolux's position. For example, Innolux's citation to the specification's description that "Vpp is supplied from an external source, an IC or other means" mirrors the use of the term in the claim language but does not contain any disclaimer that "external" cannot be a "part of" the integrated circuit. *See* Dkt. 134-2 at 6:30-32. Each of Innolux's additional citations fails for the same reason. *See* Dkt. 141 at 14 (citing Dkt. 134-2 at 6:25-30, FIGS. 4A-4B). Further, Innolux's proposal would lead to additional disputes and jury confusion about instances where a voltage source may be "not inside" of the integrated circuit, but still "a part of" its overall structure. Innolux also feigns confusion of "what the 'source for the high voltage programming means' is external to." Dkt. 141 at 14. But when read in its entirety, the claim language is clear: "[t]he integrated circuit of claim 1 wherein said circuits for programming require an external source for the high voltage programming means." Dkt. 134-2 at Claim 5. The jury will understand the claim's straightforward language—including the term "external"—and Innolux's narrow interpretation of the term only introduces unwarranted confusion to the claim.

II.    THE '788 PATENT

A.    **"Gamma reference control capability"**

Defendants' assertion that this term is indefinite is unfounded. This term is clear to a POSA and does not require construction. Dkt. 134 at 15-18. Moreover, Defendants have not overcome the presumption that "gamma reference control capability" is not a means-plus-function limitation

because it does not use the term "means." *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Instead, Defendants argue that terms that do not recite "means" must be construed as means-plus-function simply because they contain functional language. Dkt. 141 at 15-18. That would turn *Williamson* on its head. Indeed, the Federal Circuit has held that "the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018); *see also* Dkt. 134-4 at 11 ("But § 112 ¶ 6 does not apply to all functional claim language.").

Without any support, Defendants assert that "the term 'capability' is a nonce word like 'module' and 'mechanism.'" Dkt. 141 at 16. In *Williamson*, the term "module" was found to be a well-known nonce word that can operate as a substitute for "means." *Williamson*, 792 F.3d at 1350. Unlike "module," "gamma reference control capability" is not a means-plus-function term and the surrounding claim language recites sufficiently definite structure. *See Mad Dogg Athletics, Inc. v. Peloton Interactive, Inc.*, No. 2:20-CV-00382-JRG, 2021 WL 3200994, at *13-14 (E.D. Tex. July 28, 2021) (finding that "a mechanism that provides resistance to the flywheel and that is manually adjustable by the rider to vary the pedaling resistance" was not a means-plus-function term). The claimed method recites "*providing* said *display* with *gamma reference control capability* which is electrically reprogrammable and non-volatile." The noun that is being described to have a "gamma reference control capability" is the "display." In this respect, the term read in context is "reasonably used as a name to denote a class of structures and therefore sufficiently . . . maintain[s] the presumption against § 112, ¶ 6." *See also Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) (finding a functional constraint to "further narrows the scope of those structures covered by the claim and makes the term more definite"). Thus, the

6

term should be construed to have its plain and ordinary meaning because Defendants have not overcome the presumption that the term is not a means-plus-function term.

      B.        **"control circuit"**

      This term is sufficiently clear and does not require construction. Defendants conveniently omit the fact that **the Court** has already construed other "circuit" terms in the '305 Patent and found them to be sufficiently definite. Dkt. 134-4 at 27-35 (finding "circuits for programming" in the '305 Patent not indefinite). Defendants' position that the term "circuit" can only "***sometimes***" connote structure (Dkt. 141 at 18) is disingenuous. Dkt. 134-4 at 32 ("The Federal Circuit has ***repeatedly and consistently*** found that, in the electronic arts, "circuit" or "circuitry" terms connote sufficient structure to avoid means-plus-function claiming.") (emphasis added). Tellingly, Defendants go so far as to substituting the term "circuit" with the term "module" that does not appear in the claim language at all. Dkt. 104 at 18.

      Defendants' attempts to distinguish *Apex* and *MIT* notably fail to include express claim language from those cases and merely characterize it as "circuit" being accompanied by "more descriptive, structural modifier or was used in a specification that provided context and examples giving the term structural meaning" Dkt. 141 at 19. The term at issue in *Apex* was "interface circuit," *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1374 (Fed. Cir. 2003), and the term at issue in *MIT* was "aesthetic correction circuitry," *MIT & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1355 (Fed. Cir. 2006). Defendants' logic fails because in *MIT* even though "aesthetic correction" is, as Defendants' put it, "purely functional" (Dkt. 141 at 19), the Court found it to be sufficiently definite to not invoke means-plus-function. *MIT*, 462 F.3d at 1356 (citing *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("[W]hen the structure-connoting term 'circuit' is coupled with a description of the circuit's operation,

sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply.")). As to *Apex*, "interface" is no more "descriptive" or "structural" than "control." Lastly, Defendants' reliance on *Ergo Licensing*, which construes "control" in the context of ***admittedly means-plus-claims*** (e.g., "control means" and "programmable control means") is misplaced as "control circuit" does not recite "means." *See Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012).

      C.      **"means for executing a predetermined algorithm"/ "means for executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor / means for executing said predetermined algorithm"**

Defendants argue that these terms require disclosure of a specific source code algorithm. But these limitations are not directed to a specific algorithm that must be performed to optimize the gamma reference voltage levels. Rather, the limitation "**optimizing said gamma reference voltage levels *using* means for executing a predetermined algorithm** according to a predetermined criteria and data sensed by said at least one sensor" are about a structure that is capable of being programmed to the desired gamma reference voltage level. As discussed in Phenix's Opening Brief, it is the "means for executing a predetermined algorithm" that allows for the programming circuit's outputs to the desired (i.e., optimized) gamma reference voltage values. Dkt. 134 at 20-22. As set forth in the specification, the function of executing a predetermined algorithm is performed by the "programming interface"—the construction offered by Phenix. *Id*. In other words, this is a specific structure disclosed in the specification (programming interface) that performs the function of executing a predetermined algorithm according to a predetermined criteria and data sensed by said at least one sensor. Thus, no disclosure of a specific algorithm is required. *See Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 42-43 (Fed. Cir. 2020) (finding that no disclosure of specific algorithm when the identified structure is not a general-purpose computer or

processor); *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1267 (Fed. Cir. 2021) ("Because power tracker 582 is not a general-purpose computer, it does not trigger the algorithm requirement of *WMS Gaming[, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1342 (Fed. Cir. 1999)].").[5]

    **D.**       **"predetermined algorithm"**

    Defendants argue that the specification does not teach a specific algorithm. As discussed above, because the structure subject to the means-plus-function term is not a general-purpose computer, but a specific programming interface, the specification need not disclose a specific algorithm. *See supra* § II.C. Moreover, Defendants' reliance on *Kaavo*, is misplaced. The claims at issues in *Kaavo* involved a software application for use in cloud computing, and in the context of the specification, the court concluded that there was no guidance in the specification to allow a POSA to understand the term. *Kaavo Inc. v. Amazon.com Inc.*, No. 14-CV-353-LPS-CJB, 2018 WL 3025040, at *3 (D. Del. June 18, 2018). Unlike in *Kaavo*, the '788 Patent provides a POSA with guidance as to the meaning and guidance of the term. *See* Dkt. 141-7 at ¶¶ 48-50. For example, the specification provides a POSA with guidance on how to program individual cells by initiating predetermined voltage pulses. Dkt. 134-4 at 6:1-31. The specification also provides exemplary variables such as programming voltage amplitude, rise and fall time of the pulse, and pulse duration that can be considered when programming the integrated circuit but "each of these variables is influenced by design and process parameters of the particular wafer fabrication facility." *Id*. at 6:32-64. There is no requirement that the specification teach a specific "predetermined algorithm" in order to render this term understandable by a POSA. *See Freeny v.*

---

[5] Innolux mischaracterizes the PTAB's Decision Denying Institution. Institution was denied because the petition was facially deficient under 37 C.F.R. § 42.104(b)(3). Dkt. 141-8 at 23 ("For the foregoing reasons, we determine that the Petition fails to satisfy the requirements of 37 C.F.R. § 42.104(b)(3) . . . . [B]ased on this failure ***alone***, we decline to institute an inter partes review.") (emphasis added).

*Murphy USA Inc.*, No. 2:13-CV-791-RSP, 2015 WL 294102, at *25 (E.D. Tex. Jan. 21, 2015) (finding "price change algorithm" definite, reasoning "[w]hile the specification may not provide flow charts or detailed algorithms citing every line of a computer program, the specification provides guidance to this term").

> E.      "optimizing said gamma reference voltage levels"

Innolux argues the term is indefinite because it is a term of degree. But the surrounding claim language and specification sufficiently describe what "optimizing said gamma reference voltage levels" means, which is the user's desired gamma reference voltage level. Dkt. 134 at 25-26. As such, there is no requirement for the specification to provide a measurable criteria, tolerance range, or numerical threshold for the gamma reference voltage levels because such levels can vary depending on the user (e.g., panel manufacturer's display requirement). *Id*. The case law cited by Innolux is distinguishable because, in those cases, what was being optimized/tuned was truly measured by subjective standards. *See* Dkt. 141 at 27-29. Indeed, even AUO concedes that this term is definite.

> F.      "gamma reference voltage levels"

Defendants' argument mirrors its arguments for the '305 Patent's "non-volatile storage cell" claim term, seeking to limit the term to only analog memory cells. As this Court has already found and as discussed above and in Phenix's Opening Brief, the specification (which is shared between the '788 and '305 Patents) does not support such limitations. Dkt. 134-4 at 24. Thus, Defendants proposed limitations to only analog embodiments should be rejected. *Id.*

Dated: July 21, 2025                                  Respectfully submitted,

                                                               *By: /s/ Eric H. Findlay*
                                                               Eric H. Findlay
                                                               Texas Bar No.: 00789886

Email: efindlay@findlaycraft.com
T: (903) 534-1100
**FINDLAY CRAFT, P.C.**
7270 Crosswater Avenue, Suite B
Tyler, Texas 75703

Fabio E. Marino (Lead Attorney) *
California Bar No.: 183825
Email: Fabio.Marino@wbd-us.com
T: (408) 720-3436
**WOMBLE BOND DICKINSON (US) LLP**
1279 Oakmead Parkway
Sunnyvale, CA 94085

Steven M. Levitan *
California Bar No.: 148716
Email: Steve.Levitan@wbd-us.com
T: (408) 341-3045
**WOMBLE BOND DICKINSON (US) LLP**
50 California Street, Ste. 2750
San Francisco, CA 94111

Rodney Miller *
Texas Bar No.: 24070280
Kate Johnson **
Georgia Bar No.: 110551
**WOMBLE BOND DICKINSON (US) LLP**
1331 Spring Street, NW, Ste. 1400
Atlanta, GA 30309
T: 404-879-2435
Email: Rodney.Miller@wbd-us.com
Email: Kate.Johnson@wbd-us.com

John H. Wright III **
Illinois Bar No.: 6339840
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Ste 1100
Raleigh, NC 27601
T: (919) 755-2155
Email: John.Wright@wbd-us.com

Daniel M. Attaway**
Delaware Bar. No. 5130
**WOMBLE BOND DICKINSON (US) LLP**
1313 N. Market Street, Ste 1200
Wilmington, DE 19801
T: (302) 252-4320

*Admitted to the Eastern District of Texas
**Admitted Pro Hac Vice

11

Email: Daniel.Attaway@wbd-us.com

***ATTORNEYS FOR PLAINTIFF***
***PHENIX LONGHORN LLC***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 21, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing *via* electronic mail to all counsel of record.

*/s/ Eric H. Findlay*
Eric H. Findlay